## BOARD OF EDUCATION OF ANNE ARUNDEL COUNTY v. EDWARD F. BARBANO

[No. 631, September Term, 1979.]

*Decided February 14, 1980.*

The cause was argued before MOYLAN, LOWE and LISS, JJ.

28

*Thomas J. Wohlgemuth* for appellant.

*James R. Whattam,* with whom were *Walter S. Levin* and *Sauerwein, Boyd, Decker & Levin* on the brief, for appellee.

Lowe, J., delivered the opinion of the Court.

— background —

Edward F. Barbano, the appellee in this case, was a probationary teacher in Anne Arundel County. By virtue of a State Board of Education bylaw (13.06.02), two years are to be served in such capacity before a teacher may be cloaked with tenure. Within constitutional limits, and upon proper notice by the employing county board of education prior to May 1 of either of the first two years, a teacher's employment may be terminated for whatever reasons, without redress by the probationer. Unless such notice of termination is given, however, the teacher's holding of his position is protected by "tenure". This simply means that he can not be dismissed or suspended thereafter except for cause, *i.e.,* immorality, misconduct in office, insubordination, incompetency or willful neglect of duty. Md. Code, Ed. Art., § 6-202 (a) [1] (1).

---

1. Md. Code, Ed. Art., § 6-202 reads as follows:

"(a) *Grounds and procedure for suspension or dismissal.* — (1) On the recommendation of the county superintendent, a county board may suspend or dismiss a teacher, principal, supervisor, assistant superintendent, or other professional assistant for:
 (i) Immorality;
 (ii) Misconduct in office;
 (iii) Insubordination;
 (iv) Incompetency; or
 (v) Willful Neglect of duty.
 (2) Before removing an individual, the county board shall send the individual a copy of the charges against him and give him an opportunity within 10 days to request a hearing.
 (3) If the individual requests a hearing within the 10 day period:
 (i) The county board promptly shall hold a hearing, but a hearing may not be set within 10 days after the county board sends the individual a notice of the hearing; and
 (ii) The individual shall have an opportunity to be heard before the county board, in person or by counsel, and to bring witnesses to the hearing.
 (4) The individual may appeal from the decision of the county board to the State Board.
 (b) *Probationary period.* — Except for personnel of the Baltimore City public schools at the level of assistant superintendent or above, this section does not prohibit the State Board from adopting bylaws to provide for a probationary period of employment of 2 years or less."

While those grounds seem at first blush broad enough to provide substantial latitude to the employer sufficient to permit retaining only teachers of the highest caliber, the tenure provision in Md. Code, Ed. Art., § 6-202 provides further deterrents to dismissal. Before the individual can be removed for any of these causes, he must be provided notice, § 6-202 (a) (2), and a right to be heard, first by the county board, § 6-202 (a) (3), and if unsuccessful, then by the State Board, § 6-202 (a) (4).

The procedure for the dismissal is set forth in Ed. Art., § 6-202. Where the teacher has tenure, the "charges" are preferred by the county superintendent in the form of a recommendation to the county board that the teacher be dismissed for cause. Upon the proper notice, the board must hold a hearing. The practice has evolved that requires the superintendent to substantiate the cause asserted to support his recommendation. Although it is the board that makes the decision whether or not to terminate, because the teacher's contract is with it, in reality the board acts in the manner of an impartial tribunal judging the charges made by one of its employees (the superintendent) against another of its employees (the teacher) and the latter's defense to those charges.

Because of the obvious, central role that teachers play in the educational process, the policies and practices pertaining to their employment relationship are matters of considerable importance to every segment concerned with public education. This includes legislative bodies that must appropriate the money to pay the teachers' salaries, boards of education and supervisory personnel responsible for administering the school system, students (for whom the entire system exists) who expect and have a right to be properly taught, parents who pay the taxes to fund the appropriations and, of course, the teachers whose means of livelihood are at issue.

Trying to balance these interests, the General Assembly authorized the State Board of Education to provide a tenure system. Ed. Art., § 6-202 (b) provides, however, that the State Board is not prohibited "from adopting bylaws to

provide for a probationary period of employment of 2 years or less," during which a teacher's adequacy to instruct may be screened.

Most of the grounds for dismissal after the obtention of tenure are highly subjective in nature and are often incapable of precise measurement by reference to any single act. Incompetency is the most subjective of these causes and perhaps more than the others it calls for careful evaluation of the teacher during the 2-year probationary period.

Bylaw 13.06.02 was the State Board's implementation of the authority providing the probationary period. It set forth a "Regular Contract" uniformly throughout the State containing the two year probationary period provision. As time passed it became apparent that such contractual uniformity did not take into account the variables of probationers' evaluations in the 23 counties. The State Board also recognized that it was not up to the task of becoming a super-evaluator so it promulgated a study to establish evaluation guidelines. Out of respect for the divergent administrative peculiarities within the 23 counties, it did not seek a rigid uniformity but did attempt to systemize the procedure. See *Wojtulewicz v. Board of Education of Baltimore County,* No. HE-17-71-MC (May 30, 1973).

The State Board by resolution resolving to adopt "Guidelines for the Evaluation of Probationary Teachers" (guidelines), seemed to recognize the need for procedural discretion among the counties.

> "The Board does not wish to substitute its judgment for those of the evaluators who have the direct responsibility of supervising probationary teachers."

That approach was enforced by a more forceful addendum. The resolved "guidelines" compelled the county boards of education to adopt evaluation procedures which were "not inconsistent" with those which it set forth as its own guidelines by resolution.

The State guidelines [2] prescribed, among other things, a minimum number of observations of the probationary teacher each year, (4), by more than one qualified observer, after each of which the observer would consult with the teacher and submit a written report.

But the State Board's procedures *resolving* these "guidelines" left something to be desired in determining their intended effect. By Ed. Art., § 2-205, the State Board is authorized to

"adopt bylaws, rules, and regulations for the administration of the public schools", (c) (1),

and

"[t]hese bylaws, rules, and regulations have the force of law *when* adopted and *published."* (Emphasis added) (c) (2).

The statute also indicates that the establishment of a probationary period should be enacted by a bylaw, and inferentially then, so should the procedures of evaluation during that period.

"Except for personnel of the Baltimore City public schools at the level of assistant superintendent or above, this section does not prohibit the State Board from adopting bylaws to provide for a probationary period of employment of 2 years or less." Ed. Art., § 6-202 (b).

Why the State Board elected to proceed by "resolving" to "adopt guidelines" rather than by enacting a bylaw, or even a rule or regulation as established statutorily for administrative procedures, is unknown. What is certain, however, is that by failing to more formally legislate or regulate as authorized, the guidelines have neither the force nor the effect of law. Even if interpretatively this resolve could be called by any other name, *e.g.,* a bylaw, rule or regulation, its enactment did not comply either with § 2-205

2. See Appendix I.

(c) (2) which withholds endowing them with the force of law until adopted *and published,* or with Md. Code, Art. 41, § 9 (as it then read) which required that copies of any rule or regulation enacted by a regulatory entity should be filed with the Clerk of the Court of Appeals, the Secretary of State, the State Library, the circuit court libraries and with the Department of Legislative Reference, before it becomes legally effective.

Effective or not, the Anne Arundel County Board of Education (appellant here) presumably attempted to comply with the State Board's resolve, but again the method of compliance did not conform even to that which the State Board's resolution called for. The county board did not "adopt evaluation procedures" as the State Board's resolution provided it "shall" do; rather, according to the record, a Director of Staff Relations in the Anne Arundel County Department of Education sent out a memorandum to "All Principals" enclosing a copy of the "Guidelines for the Evaluation of Probationary Teachers recently adopted by the State Board of Education and effective September 1, 1974." The memo then compared the guidelines' requirements with the "TAAAC [Teachers Association of Anne Arundel County] negotiated agreement" which had been previously negotiated and adopted in that County. The Director's memo explained that:

> "In implementing Article 16 of the TAAAC — Board agreement, the principal can also satisfy the requirements of the State guidelines, except that the following provisions of the latter go beyond the requirements of the local agreement and must, therefore, be observed:
>
> 1. For probationary teachers, conferences and written reports must follow each of *four* conferences per year.
>
> 2. For probationary teachers the rating must be based on the conclusions and assessments of *more that* [sic] *one staff member.*
>
> 3. The rating must be considered as a factor in

recommending non-renewal of a probationary teacher's contract."

— this case —

In the case of probationary teacher Edward F. Barbano, it is uncontested that there has been less than absolute adherence to the State Board guidelines; however, the State Board decided (contrary to the recommendation of its examiner) that the evaluation had been adequate because it had been fair and impartial. The deviation from categorical adherence to these guidelines, in the opinion of the State Board, was not prejudicial to Barbano in that there had been "substantial adherence to their provisions" during the period when Barbano's performance "was found wanting".

Barbano appealed that decision to the Circuit Court for Anne Arundel County which ultimately reversed the State Board's affirmance of the County Board's refusal to renew Barbano's contract. The *only* issue which it decided was:

"What is the legal effect of a County Board of Education's decision not to renew a probationary (non-tenured) teacher's employment contract, when that decision is arrived at following less than absolute adherence to 'guidelines' adopted by the State Board of Education?"

The trial judge held that despite the unenforceability of the State Board's resolution, not having the force of law,[3]

"since the State Board promulgated the guidelines, both it and the County Boards are constrained to observe their terms."

He further decided that even analogizing the statutory authority of the State Board to explain and interpret its own bylaws, rules and regulations, with the exclusive right to explain and interpret its own resolved guidelines, the minimum observations, reports, conferences and observers which were not met by the County authorities, were

---

**3.** The judge so decided because of noncompliance with the publication provision of § 2-205 (c) (2).

"numbers" which were too clear to be subject to explanation or interpretation. The right-to-interpret provision he referred to is another unique provision found in the broad fields of education which at the time of the State Board hearing read: [4]

"The State Board of Education shall, to the best of their ability, cause the provisions of this article to be carried into effect. They shall determine the educational policies of the State; they shall enact bylaws, rules and regulations for the administration of the public school system, which when enacted and published shall have the force of law. For the purpose of enforcing the provisions of this article, and the enacted and published bylaws, rules and regulations of the Board, the State Board of Education shall, if necessary, institute legal proceedings. The State Board of Education shall, without charge and with the advice of the Attorney General of Maryland, explain the true intent and meaning of the law, and shall decide all controversies and disputes that arise under it, and their decision shall be final; and the secretary of the State Board of Education shall have authority to administer oaths, in any part of the State, to witnesses in any matter pending before said Board." Md. Code, Art. 77, § 6.

— administrative precedent —

Prior to Barbano's case, which the State Board decided on June 29, 1977, it had previously decided two similar cases

---

4. The provisions are now recodified in Ed. Art., § 2-205 (e) which reads:

"(e) *Interpretation of law; controversies and disputes.* — (1) Without charge and with the advice of the Attorney General, the State Board shall explain the true intent and meaning of the provisions of:

(i) This article that are within its jurisdiction; and

(ii) The bylaws, rules, and regulations adopted by the Board.

(2) The Board shall decide all controversies and disputes under these provisions.

(3) The decision of the Board is final."

using divergent explanations. In *Eugene P. Macri v. Board of Education of Washington County,* No. HE-9-76-FD (November 23, 1976), the majority of a divided State Board found that its "Guidelines for the Evaluation of Probationary Teachers" stated minimum standards that "should be followed with reasonable precision" even where the result is to grant tenure to a teacher whose qualifications are in doubt. In *Gloria Summers v. Board of Education of Frederick County,* No. 77-8 (No. HE-18-76-MC) (March 30, 1977), however, the State Board backed away from its decision in *Macri.* Adopting the Findings and Conclusions of the Hearing Examiner, the State Board found that its guidelines could be followed without rigid adherence if they had been substantially complied with.

> "[T]he underlying purpose of the guidelines is not to assure that a probationary teacher will be given a fixed number of written reports, but rather that he or she will be given every reasonable opportunity to correct deficiencies and will be given adequate notice that failure to correct is likely to result in non-renewal."

Subsequently, in this case, *Barbano v. Board of Education of Anne Arundel County,* No. 77-11 (No. HE-21-76-FD) (June 29, 1977), the State Board relied for its decision upon *Summers,* not *Macri.* The State Board held that so long as the facts indicated that the probationary teacher had been fairly and impartially evaluated, it was irrelevant that the guidelines were not categorically adhered to. Based upon this holding, the State Board affirmed the County Board's decision not to renew appellee's employment contract, after his second year of probationary employment.

— the *Accardi* doctrine —

In reversing the State Board, the trial judge emphasized that he did not intend to interfere either with the interpretive right of the State Board's regulations or its power to control public schools.

"It seems beyond dispute that numbers, which are

the essential characteristics of the provisions listed above, cannot have any possible meaning other than their manifest expression. Thus, the nature of the particular provisions of the guidelines involved in this case is such that it permits no interpretation or explanation. This finding in no way detracts from the concededly special powers of the State Board to control and supervise the public schools. *Robinson v. Board of Education of St. Mary's County,* 143 F. Supp. 481 (D. Md. 1956); *Zeitschel v. Board of Education of Carroll County,* 274 Md. 69, 332 A.2d 906 (1975)."

He then went on to hold essentially that unless the language of bylaws, rules, regulations (or analogous resolved guidelines) is ambiguous, the State Board must strictly compel adherence to them. This ruling was obviously contrary to the State Board's own opinion in *Summers* that substantial compliance would suffice.[5] The judge's opinion said in part:

"This Court only finds that, when the State Board purports to control and supervise by promulgating guidelines for evaluation of probationary teachers, it must be bound by its own decision. In accord with this finding, the following language seems particularly fitting:

'Where an Agency confers a benefit by its regulations to a party in proceedings before it, it should not be permitted capriciously to deprive a party of that benefit.' *Equal Employment Op.*

5. The State Board recognized its own conflicting opinions and in essence reversed itself in a footnote which said:

"We recognize that while this determination is in consonance with our decision in *Summers v. Board of Education of Frederick County,* Opinion 77-8, decided March 30, 1977, it may be difficult to harmonize it with our decision in *Macri v. Board of Education of Washington County,* decided November 23, 1976. As this opinion demonstrates, the questions at issue have been further analyzed by the Board and the Board will henceforth be guided by the views expressed herein."

*Com'n. v. United States Pipe & F. Co.,* 375 F. Supp. 237, at 247 (N.D. Ala. 1974).

This holding is in accord with what seems to be the general rule in the sphere of administrative law: that action taken by an administrative agency in violation of its own procedural requirements cannot stand, and must be stricken down by the courts. E.g., *Hopkins v. Md. Inmate Griev. Comm'n.,* 40 Md. App. 329, 391 A.2d 1213 (1978), and cases cited therein. This doctrine has been expanded to encompass administrative procedures promulgated in forms other than formal rules and regulations. E.g., *United States v. Heffner,* 420 F.2d 809 (4th Cir. 1969) (I.R.S. news release); *Mandel v. U.S. Dept. of Health, Ed. and Welfare,* 411 F. Supp. 542 (D. Md. 1976), *modified on appeal,* 562 F.2d 914 (4th Cir. 1977) (pamphlet or policy statement). Also, the general rule seems to be that an administrative agency must follow its own procedures, whether the particular proceedings are 'adjudicative', 'investigative' or 'legislative' in character. Cases in other Circuits have indicated that they would limit these general rules. E.g., *Union of Concerned Scientists v. Atomic Energy Com'n.,* 499 F.2d 1069 (D.C. Cir. 1974) (violation of agency 'doctrine' distinguished from violation of a rule or regulation); *United States v. Leahey,* 434 F.2d 7 (1st Cir. 1970) ('adjudicatory — investigatory dichotomy'). However, this Court finds the rule in the Fourth Circuit, and the better rule, to contemplate that an administrative agency is required to absolutely comply with the guidelines as well as the rules and regulations it promulgates and that this rule applies equally to adjudicative and investigative agency activities. See *United States v. Heffner, supra; Mandel v. U.S. Dept. of Health, Ed. and Welfare, supra; Equal Employment Op. Com'n. v. Western Electric Co., Inc.,* 382 F. Supp. 787 (D. Md. 1974); *Equal Employment Op. Com'n v. Westvaco Corp.,*

372 F. Supp. 985 (D. Md. 1974); *Equal Employment Op. Com'n. v. Firestone Tire & Rubber Co.,* 366 F. Supp. 273 (D. Md. 1973); *Hopkins, supra.*[6]

There are recognized exceptions to the rule that an agency must carefully follow its own procedural requirements. However, these exceptions seem to be limited to situations other than what is presented in the instant case. E.g., *American Farm Lines v. Black Ball Freight,* 397 U.S. 532, 25 L. Ed. 2d 547 (1970) and *Matthews v. Walter,* 512 F.2d 941 (D.C. Cir. 1975) (where procedural rules are intended to ensure 'the orderly transaction of agency business', as opposed to being 'intended to "confer important procedural benefits" upon the parties before the agency'.); *Taylor v. Maryland School for the Blind,* 409 F. Supp. 148 (D. Md. 1976), *affd.* 542 F.2d 1169 (4th Cir. 1976) ('some greater interest was served by the violation'). This Court agrees with the Hearing Examiner's opinion that the guidelines at issue here were meant to function in part as aids to assist probationary teachers in becoming competent. As such, the guidelines were meant to confer an important procedural benefit upon probationary teachers, a benefit which must be protected by

---

**6.** All of these cases cited by the trial court involve rules, regulations, or other informal guidelines promulgated primarily if not specifically for the benefit of the individual. United States v. Heffner, *supra* (IRS instructions *for procedure to protect constitutional rights of persons suspected of criminal* tax fraud, during all phases of its investigations); Mandel v. U.S. Dept. of Health, Ed. and Welfare, *supra* (Policy statement wherein if a school system is not in compliance with Title VI, the Office for Civil Rights will inform the school system in detail of the areas in noncompliance before commencing enforcement procedures); Equal Employment Op. Com'n v. Western Electric Co., Inc., *supra* (EEOC regulation requiring notice that suit would be filed against individual unless individual requests that conciliation be resumed); Equal Employment Opportunity Com'n v. Westvaco Corp., *supra* (EEOC regulation that conciliation is an essential step to be taken before suits can be filed against an employer on charges of discrimination. If conciliation fails the EEOC must notify the parties); Equal Employment Op. Com'n v. Firestone Tire and Rubber Co., *supra* (EEOC regulation requiring right of notice designed to insure that the statutory mandate of attempts at conciliation is carried out); Hopkins, *supra* (Procedural rule that inmate be given a hearing within 72 hours of an alleged violation).

requiring strict adherence to the provisions of the guidelines."

— our opinion —

The concluding premise underlying the trial judge's opinion, *i.e.,* that

"the guidelines were meant to confer an important procedural benefit upon probationary teachers . . . ."

is at best questionable. That probationers are the beneficiaries carries a seed of correctness but other beneficiaries of the guidelines appear to sprout like springtime croci from them also. To have rested his opinion on that premise overlooks the practical purpose as well as the underlying concept from which the guidelines emanated. That purpose — and its tangential benefits — were discussed by the State Board in its opinion prefacing enactment of the resolution attempting to adopt them. It was set out at length in *Wojtulewicz v. Board of Education of Baltimore County* decided May 30, 1973. Because the State Board found it

". . . practically impossible to substitute our judgment for those of the educators who have the direct responsibility of supervising probationary teachers,"

the Board expressed a more basic concern that the administrative procedural hodge-pot would deter the dismissal of incompetents during the dismissable period.

"Moreover, we are concerned that an elaborate appeals procedure involving non-renewal of the contracts of probationary teachers would discourage local administrators from taking stern action against teachers who proved themselves inadequate during the probationary period and that a stream of appeals would seriously interfere with the regular workload of educational administrators and boards of education."

Added to these primary concerns was the danger of losing a good teacher by a jaded supervisor who unchecked may abuse his discretion.

"At the same time we are not unmindful of the danger of abuse of discretion, of the danger that a bright and resourceful new teacher could be penalized by a principal or supervisor who has grown old and tired in his job and feels himself threatened."

These were some of the problems of which the Board was aware

"and want to see to it that they are avoided."

The Board then directed its staff to study and develop guidelines for the evaluation of probationary teachers. The guidelines, it decided, need not be so rigidly uniform as to discount divergent administrative resources in the respective counties; however,

"[i]n each county, be it large or small, there shall thus be put into effect a system in which the arbitrary decision of a single supervising person could not stand in the way of a probationary teacher's career."

It is apparent then, that while the State Board recognized that among the many benefits to be derived from these guidelines was "the procedural benefit [conferred] upon probationary teachers" (as indicated by the court below), it also recognized that the primary concern was the obtention of good teachers and the prevention of bad ones which is in accord with the underlying concept of the whole scheme of education. The primary purpose of the State Board of Education is not to bestow procedural benefits upon teachers of questionable competency, but to bestow upon students education by teachers of unquestionable competency. While the former frequently coincides with the latter, where the two may conflict, the former must unquestionably give way.

But more to the point of this case are neither the tangential

benefits bestowed by the guidelines nor the philosophical reasons for their promulgation. The point of concern is the immediate *purpose* for the guidelines. With the philosophical chaff blown off, the purpose is reduced to that expressed by the Board in *Wojtulewicz, i.e.,* to provide

". . . a system . . . .";

or, as explained by the dissent in *Macri* which was subsequently followed in *Summers,*

"[w]e wanted to see to it that a set of practices was followed by each local school system . . . . So as to make sure that each public school system would adopt appropriate rules . . . ."

It is apparent then that the trial judge was in error in applying to this case that which we referred to in *Hopkins v. Md. Inmate Griev. Comm'n,* 40 Md. App. 329 (1978), as the "Accardi doctrine", denominated by reason of its origin (*U.S. ex rel. Accardi v. Shaughnessy,* 347 U.S. 260 (1954)). To express the "doctrine" we chose the language from *United States v. Heffner,* 420 F.2d 809, 811 (4th Cir. 1970):

"An agency of the government must scrupulously observe rules, regulations, or procedures which it has established. When it fails to do so, its action cannot stand and courts will strike it down."

The Supreme Court in *American Farm Line v. Black Ball Freight Service,* 397 U.S. 532, 538-539 (1970), however, treated the "doctrine" as an exception, while acknowledging that government agencies must comply with their own regulations. That is so when the regulations are intended primarily to confer important procedural benefits upon individuals.[7] Absent such purpose, the "general principle" holds true:

---

7. In this Supreme Court case as well as in the case at bar, it was argued that the agency rules were adopted to confer important procedural benefit upon individuals. The Supreme Court found, however, that those rules were intended *primarily* for the purpose of providing necessary information for the orderly transaction of business. While the procedural rules may have

> " 'It is always within the discretion of a court or an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it.' " *Id.* at 539, quoting *NLRB v. Monsanto Chemical Co.,* 205 F.2d 763, 764 (1953).

In *Hopkins, supra* at 336, we acknowledged that Supreme Court holding, but recognized it only as an "exception" to the *Accardi* "doctrine". By whatever designation it is apposite here.

In the case at bar we are reviewing resolved guidelines without the force and effect of properly enacted rules, regulations or bylaws. More significantly, they are the resolves of a unique branch of government given peculiarly autonomous powers among which is the authority to explain the true intent and meaning of not only the rules, regulations and bylaws adopted by the Board, but the very provisions legislatively authorizing the powers and duties, etc., of the Board itself. Ed. Art., § 2-205 (e) (see old Art. 77, §§ 6, 59). It is just such singular authority together with similar indicia of autonomy peculiar to the education field that caused the Court of Appeals in 1963 to hold that the State Board was invested with

> "the last word on any matter concerning education policy or the administration of the system of public education." *Wilson v. Board of Education,* 234 Md. 561, 565 (1964).

This observation was reemphasized by repetition in 1979, *Resetar v. State Bd. of Education,* 284 Md. 537, 556 (1979), *cert. denied,* 444 U.S. 838, 62 L. Ed. 2d 49 (1979). The specific authority to explain the true intent and meaning of its own laws and to decide all controversies and disputes that may arise under it was acknowledged 100 years before *Resetar,* as a "visitatorial power of the most comprehensive character".

---

provided benefits to individuals, that was not intended as their primary purpose. Thus the Court found "no reason to exempt this case from the general principle".

*Wiley, et al., Trustees v. Board Co. School Comm'rs of Allegany Co.,* 51 Md. 401, 406 (1879). The Court in *Wiley* went on to explain both origin and purpose as regarded it:

> "[A]nd it has been settled ever since the great case of *Phillips v. Bury, (Lord Raym.,* 5, 2 *Dun. & East,* 346,) that such power is, in its nature, summary and exclusive. In delivering the judgment in the case of *St. John's College vs. Toddington,* 1 *Burr.,* 159, 200, Lord MANSFIELD said that 'the visitatorial power, if properly exercised, without expense or delay, is useful and convenient to colleges; and it is now settled and established that the jurisdiction of a visitor is summary and without appeal from it.' And it may be added, that such power is not more useful and convenient to colleges than to other well organized educational establishments. If every dispute or contention among those entrusted with the administration of the system, or between the functionaries and the patrons or pupils of the schools, offered an occasion for a resort to the Courts for settlement, the working of the system would not only be greatly embarrassed and obstructed, but such contentions before the Courts would necessarily be attended with great costs and delay, and likely generate such intestine heats and divisions as would, in a great degree, counteract the beneficent purposes of the law. It is to obviate these consequences that the visitatorial power is conferred; and wherever that power exists, and is comprehensive enough to deal with the questions involved in an existing controversy, as the case here, Courts of equity decline all interference, and leave the parties to abide the summary decision of those clothed with the visitatorial authority." [8]

---

[8] The jurisdiction of this Court beyond "the inherent power [it] possess[es] to review and correct actions by an administrative agency which are arbitrary, illegal, capricious or unreasonable", Criminal Inj. Comp. Bd. v. Gould, 273 Md. 486, 501 (1975), has not been raised.

In the face of such awesome authority, how can we fail to apply that exception to the *Accardi* doctrine, allowed more mundane agencies, when the State Board interpreting its own authority has indicated that the guidelines which resolved to avoid an elaborate appeals procedure were administrative rules for the orderly transaction of business, *i.e.,* to provide "a system" applicable among the 23 counties.

The trial judge erred by placing inordinate emphasis upon the Hearing Examiner's conclusion that

"the guidelines at issue here were meant to function in part as aids to assist probationary teachers in becoming competent,"

as being the primary purpose of guidelines. That may indeed have been a beneficial offshoot, but the Board's own opinions are clear that the guidelines were intended to provide a degree of uniformity (though not express uniformity) in guiding the divergent county boards in negotiating annually such procedures with the union-like representatives of the teachers.

— the next case —

The "rights" — if any — that enure to the benefit of the probationer from the guidelines may be protected by his contractual right, to the extent a contract exists, or deprivation of due process, to the extent such constitutional rights exist. The trial judge expressly declined to address the termination vis-a-vis the negotiated agreement between the Teachers' Association and the County Board of Education of Anne Arundel County; [9] nor did he address the "legal adequacy of the notice of termination" which may also (but

---

9.
"Not presently before this Court are the issues of the legal adequacy of the notice of termination given Appellant [appellee here], and the legal effect of a termination decision reached following less than absolute adherence to the provisions of the negotiated agreement entered into between the Teachers' Association of Anne Arundel County and the Anne Arundel County Board of Education."

probably does not) [10] affect the due process question on a constitutional level. We will not address those issues either because the trial judge has not decided them. Md. Rule 1085. He will be given that opportunity upon remand.

We find it necessary briefly to address another issue raised by appellant, that is that

> "[t]he State Board of Education had no Jurisdiction to Hear the Complaint of the Appellee, Barbano Involving as it did a Purely Legal Question Relating to the Law of Contracts."

While we are somewhat confounded by appellant's tactic of attacking the jurisdiction of the body before which it prevailed, we will address the issue, if but passingly brief.[11] Suffice to say, we agree with the conclusion of the trial judge who said:

> "More recently in, *Zeitschel v. Board of Education,* 274 Md. 69 (1975), the Court of Appeals, in a case involving the State Board of Education's review of a local board of education's decision to terminate a probationary teacher's employment, decided the appeal on the merits. While the jurisdiction of the State Board of Education was not raised on the appeal, the Court of Appeals clearly indicated that the matter was one within the jurisdiction of the State Board of Education. This Court finds, that, *Zeitschel, supra,* is controlling on the issue of the State Board of Education's jurisdiction on the issue relating to the lack of a proper evaluation in this

---

**10.** It is questionable where a probationer possesses a requisite "interest" in continued employment to give standing in a constitutional sense. See Bishop v. Wood, 426 U.S. 341 (1976); Tennessee v. Dunlap, 426 U.S. 312 (1976); Perry v. Sindermann, 408 U.S. 593 (1972); Board of Regents v. Roth, 408 U.S. 564 (1972); Small v. Sec. of Personnel, 267 Md. 532 (1973); Ahlgren v. Cromwell, 179 Md. 243 (1941).

**11.** In light of the immense legislative authority vested in the State Board coupled with the judicial deference paid it over the years, it seems more likely that one would question the right to appeal from the Board's rulings rather than the right to appeal to the Board.

case. The appeal as to this issue, must be allowed to stand."

We also note that the Court of Appeals in *Wilson, supra,* had no difficulty finding authority for the State Board to review such cases.

"For present purposes it is immaterial, we think, whether the power exercised in the instant case is viewed as an exercise of the rulemaking power, as the resolution of a dispute, or as a matter of general control and supervision. In any aspect the problem of screening employees is one of administrative policy, and the mere fact that the solution is initially within the scope of the County Board's authority does not negative the power of the State Board to review it and set it aside, as the cases cited demonstrate." *Wilson, supra* at 565.

> *Judgment reversed.*
> *Case remanded for determination of the issues undecided.*
> *Costs to be paid by the appellee.*

Appendix I.

"RESOLUTION
MARYLAND STATE BOARD OF EDUCATION
December 19, 1973

Resolution No. 1973-49 Re: Adoption of Guidelines for the Evaluation of Probationary Teachers

WHEREAS, Disputes and controversies have arisen over the non-renewal of contracts of probationary teachers; and

WHEREAS, The State Board of Education believes that there should be in existence a fair and impartial system for the evaluation of probationary teachers by their fellow professionals; and

WHEREAS, The Board does not wish to substitute its judgment for those of the evaluators who have the direct responsibility of supervising probationary teachers; now, therefore, be it

RESOLVED, That the State Board of Education adopt Guidelines for the Evaluation of Probationary Teachers which follow:

## PROPOSED GUIDELINES FOR THE EVALUATION OF PROBATIONARY TEACHERS

Each county board of education and the Board of School Commissioners of Baltimore City shall adopt evaluation procedures for probationary teachers, to become effective September 1, 1974, which are not inconsistent with the following provisions:

*Observations*

1. Teachers who have not achieved tenure status shall be observed periodically at least four (4) times during the school year by the staff of each local board of education and the staff of the School Commissioners of Baltimore City as determined by the superintendent. Each observation of performance shall be conducted openly and with full knowledge of the teacher for a period of time sufficient for an adequate appraisal of that instructional activity.

2. The teacher shall be observed by more than one qualified person each year as determined by the superintendent.

3. Within a reasonable period of time subsequent to each observation, the observer will hold a conference with the teacher, at which time a written observation report shall be submitted. The report should include, where appropriate, favorable comments, criticisms and specific recommendations for improvement.

*Evaluations*

1. A formal evaluation including a conference shall be made at least once each semester.

2. The evaluation shall be based on the conclusions and assessments reached by more than one staff member.

3. The evaluation shall be based on the observations of the teacher's performance and other reasonable criteria established by local boards of education and the Board of School Commissioners of Baltimore City.

4. Provision shall be made for an over-all assessment by the evaluator which clearly indicates a satisfactory or unsatisfactory rating.

5. The written evaluation report based on performance and other reasonable criteria established by the local boards of education and the Board of School Commissioners of Baltimore City shall be shown to the teacher within a reasonable period of time subsequent to the aforementioned conference. At that time, the teacher shall sign the report and receive a copy thereof. Such signature will, however, not necessarily indicate agreement with the evaluation. Provision shall be made for written comments and reactions by the teacher(s) which shall be attached to the evaluation report.

6. Except for bona fide reductions of staff, the superintendent's recommendation as to non-renewal of contract of probationary teachers shall be based on the evaluation report and other reasonable criteria established by local boards of education and the School Commissioners of Baltimore City prepared in accordance with these provisions.

Copies of new evaluation procedures developed by local

school systems and based on State Guidelines For The Evaluation Of Probationary Teachers shall be submitted to the State Superintendent of Schools not later than September 1, 1974."