468 A.2d 1026

**KENNEDY TEMPORARIES**

v.

**COMPTROLLER OF THE TREASURY.**

No. 484, Sept. Term, 1983.

Court of Special Appeals of Maryland.

Jan. 4, 1984.

24

Carl F. Ameringer, with whom were Michael Esher Yaggy, and Niles, Barton & Wilmer, Baltimore, on brief, for appellant.

William A. Kahn, Asst. Atty. Gen., with whom were Stephen H. Sachs, Atty. Gen. and Gerald Langbaum, Asst. Atty. Gen., on brief, for appellee.

Argued before MOYLAN, LISS and WILNER, JJ.

WILNER, Judge.

Appellant bid on a State contract. He was underbid by one of his competitors and therefore did not get the contract. Alleging that the low bidder should have been disqualified because of an insufficient bid bond, appellant eventually commenced a proceeding that has grown in complexity at each successive stage. We now have before us cross-appeals from a judgment of the Circuit Court for Baltimore City involving significant questions concerning the State procurement law, the regulations issued under it, the jurisdiction and authority of the State Board of Public Works and the State Board of Contract Appeals, the right of a bidder "entitled" to a contract to recover damages from the State for the wrongful award of the contract to another bidder, the doctrine of sovereign immunity, and assorted alleged waivers.

It will not be necessary for us to address all of these issues, because we think that (1) appellant has no standing to make the complaint that has engendered them, and (2) even if he had such standing, at a critical stage he effectively waived his right to adjudicate that complaint. Unfortunately, in order to demonstrate how that occurred, we shall be obliged to discuss in some detail not only the factual and procedural history of the case but also the procurement law, the regulations issued under it, and some of the procedures mandated by the law and the regulations.

## I. *The Procurement Law*

In 1980, after several years of study, the General Assembly enacted a new procurement code for the State. It took effect July 1, 1981, and is presently codified as Md.Code Ann. art. 21.

The heart of the law is § 2–201(a), which states simply that no State agency in the Executive Branch "may enter into a contract for supplies, services, or construction except in accordance with the provisions of this article and the regulations established pursuant to this article." The law then sets forth some basic rules governing the methods by which the State is to select and deal with its suppliers. In title 3, for example, it authorizes five types of source selection (§ 3–201(a)), establishes a preference for one of them—competitive sealed bidding (§ 3–201(b)), and requires that when that method is used, "[t]he contract shall be awarded to the responsive and responsible bidder whose bid is . . . the lowest bid price. . . ." Other sections in title 3 specify qualification standards for bidders (subtitle 4), bond requirements (subtitle 5), and restrictions on certain types of contracts (subtitle 7).

In title 7 (§ 7–201), the law establishes a specific four-step procedure for resolving disputes relating to both the formation of a contract (i.e., the award of a contract) and a contract already awarded. The first step is the agency procurement officer who, upon timely demand, and "consistent with . . . all applicable laws and regulations," is authorized to "negotiate and resolve" these disputes, including disputes "concerning the qualification of bidders . . . and the determination of the successful bidder. . . ." (§ 7–201(a)). The second step is review of the procurement officer's decision by the agency head, who may "approve or disapprove the procurement officer's decision" and whose determination "is deemed final action by the agency. . . ." (§ 7–201(c)). The third step is an appeal to the Board of Contract Appeals, an independent entity created by § 7–202. The decision of that Board, according to § 7–201(d), "is final

only subject to judicial review." Judicial review, in accordance with the Administrative Procedure Act, is the fourth and final step. (§ 7–203).

Subject to these statutory criteria, the essential thrust of the law is to continue overall control over State procurement in the Board of Public Works, where it has resided for at least fifty years, but to permit the Board, by regulation, to delegate part of its control authority to four other State agencies having special procurement responsibilities—the University of Maryland and the Departments of Budget and Fiscal Planning, General Services, and Transportation. These five agencies—but primarily the Board of Public Works—are directed to develop the necessary implementing details and procedures by administrative regulation. We see this in § 2–101.

Section 2–101(a) places in the Board of Public Works "power and authority over the procurement, management, and control of all supplies, services, construction, and other items procured by the State." *See also* Md.Code Ann. art. 78A, §§ 1B and 10. To carry out the provisions of the statute, the Board "has authority to set policy and to adopt regulations which are consistent with this article," as well as to exercise any authority conferred on the other four specified agencies. Subsection (b) also deals with regulations. It states, in relevant part, that the Board "shall adopt regulations, consistent with this article, governing procedures for the review and approval of procurement contracts . . . [and] procedures for review of determinations. . . ." The Board is further directed to "ensure that the regulations of the procurement agencies provide for procedures which are consistent with this article and which are substantially the same among the agencies."

The four departmental procurement units derive their special authority from § 2–101(c). That section directs each of those agencies to adopt regulations "consistent with this article" concerning a number of things, including

"[r]ejection of bids, consideration of alternate bids, and waiver of informalities in bids."

Regulations were, in fact, adopted by the Board and the four other agencies, effective July 1, 1981. They appear in COMAR, Title 21, and include, among other things, procedures and requirements relating to bid bonds (21.06.07), protests (21.10.02), the Board of Contract Appeals (21.02.02 and 21.10.06), and the waiver of minor irregularities and deficiencies in bids (21.05.02.12 and 21.06.02.03). Approval authority over certain types of procurement contracts was delegated to the other four agencies (21.02.01.03–07), but anything not delegated was reserved to the Board of Public Works. With respect to any such contracts (including service contracts exceeding $100,000), the agency procurement officer has no authority to award the contract. His decision, or, upon review, that of the agency head or the Board of Contract Appeals, is in the nature of a recommendation to the Board of Public Works, which alone can approve or reject.

When these various provisions governing the dispute-resolution process and the overall authority of the Board of Public Works are read together harmoniously, as they should be, the legislative intent seems clear that the dispute-resolution process set forth in § 7–201 should be completed before the Board of Public Works, as the final approval authority, acts on a disputed matter concerning contract formation, in order that the Board may then act in conformance with the decision reached through that process. That is what § 2–201(a) would seem to require; and only in that manner can the prerogatives of the Board under the law be clearly and neatly meshed with the more specific criteria and procedures mandated by the General Assembly.

## II. *Factual and Procedural Setting*

At some point in the early fall of 1981, the Comptroller of the Treasury determined that he would need additional temporary personnel to assist in the processing of income tax returns expected to be received during the winter and

spring of 1982. On October 1, 1981, through his procurement officer, John A. Clinton, the Comptroller issued an invitation to about twenty companies to bid on a contract to provide such personnel for the period January 1—June 30, 1982. Enclosed with the invitation was a memorandum describing the bidding process. Paragraph P of that memorandum dealt with bid bonds. Reflecting the provisions of Md.Code Ann. art. 21, § 3–504 and COMAR 21.06.07.01 and .02, Paragraph P stated:

> "Bids exceeding $25,000 in anticipated price must contain a Bid Bond in an amount equal to at least five percent (5%) of the total amount bid. The preferred bid security is a bond in form satisfactory to the State underwritten by a company licensed to issue bonds in Maryland. The bond shall be in substantially the form contained in Appendix (F). State procurement regulations permit other forms of bid securities. Contact the issuing officer to discuss any other form of bid security. *Failure to provide an acceptable bid security with the bid when required shall result in the bid being rejected."* (Emphasis in original.)

When the bids were opened on November 17, 1981, it appeared that the two lowest bidders were Bay Services, Inc. at $608,159, and Kennedy Temporaries at $621,502. Bay Services' bid was accompanied by a bid bond, in proper form, in the amount of $30,000, which was $407.95 short of five percent of its bid. Kennedy did not submit a bid bond. Its bid was accompanied by a letter from a branch officer of Maryland National Bank stating, in relevant part:

> "As part of the above bid proposal, it is necessary to provide a $50,000.00 'Bid Proposal Bond.'
>
> Please be advised by this letter that Maryland National Bank guarantees to provide any collateral necessary to the State of Maryland to be held as collateral against performance; should Stephen G. Kennedy's bid be accepted by the State of Maryland."

Mr. Kennedy was in attendance when the bids were opened, and he asked if he could see the amount of the bid bond posted by Bay Services. The procurement officer initially rejected his request—"until we got everything sorted out"—but permitted such an inspection on November 23, 1981. Mr. Kennedy then noticed the shortfall and pointed it out to Ms. Mary Ann Porter, the personnel manager of the Comptroller's office, indicating that, as a result of the deficiency, the Bay Services bid should be rejected. The next day, Mr. Clinton, the procurement officer, called, and Kennedy iterated his complaint to him.

On November 25, 1981, Clinton wrote to Bay Services, pointing out the deficiency in the bid bond and advising that "a question has been raised" with respect to it. Clinton called attention to COMAR 21.05.02.12, permitting him to waive "technicalities or minor regulations [*sic*, irregularities] in bids," and COMAR 21.06.02.03, defining "minor irregularity" and empowering the procurement officer to "give the bidder . . . an opportunity to cure any deficiency resulting from a minor informality or irregularity in a bid . . . or waive the deficiency, whichever is to the advantage of the State."

Obviously regarding the shortage in the bid bond as "minor," Clinton purported to exercise his prerogative under the latter regulation and directed Bay Services to file an additional $500 in approved security by December 1, 1981. A copy of that letter was sent to Kennedy. Two days later—on November 27—Clinton sent another letter to Bay Services, again with a copy to Kennedy. In this letter he abandoned reliance on COMAR 21.05.02.12 and 21.06.02.03 and instead invoked his authority under COMAR 21.06.07.-02B. That regulation provides, in relevant part:

"If a bid does not comply with the security requirements of this regulation, the bid shall be rejected as nonresponsive, unless the failure to comply is determined by the procurement officer to be nonsubstantial when:

 \* \* \* \* \* \*

(2) The amount of the bid security submitted, though less than the amount required by the invitation for bids, is equal to or greater than the difference in the price stated in the next higher acceptable bid. . . ."

Because the $30,000 bid bond filed by Bay Services was greater in amount than the $13,000 difference between its bid and that of Kennedy, Clinton concluded that the deficiency was "nonsubstantial" and would therefore be excused altogether. He ended the letter with the statement, "your bid bond is accepted without any need for further action."

In addition to sending Kennedy a copy of this November 27 letter, Clinton wrote a separate letter to Kennedy the same day. Noting that Kennedy had "questioned our decision to award the above captioned contract to the lowest bidder, Bay Services Incorporated," Clinton advised that he had "determined that the award can be made to the low bidder pursuant to COMAR 21.06.07.02B(2)," which he then quoted. He ended this letter by repeating his determination that the inadequacy in the Bay Services bid bond was non-substantial and that, based upon the regulation, the Comptroller's Office "will recommend to the Board of Public Works that this contract be awarded to the low bidder, Bay Services Incorporated."

On December 2, 1981, the matter was taken up by the Board of Public Works which, as we have noted, retained under the law full approval authority over service contracts exceeding $100,000. The transcript of that meeting shows that both Mr. Clinton and Mr. Kennedy appeared and presented their respective views.[1] No mention was made by Mr. Clinton (or by anyone else) of the lack of written protest; but neither did Mr. Kennedy give any indication that he intended to pursue the matter before the Board of Contract Appeals. Clinton maintained that the deficiency in

---

1. The transcript of the Board meeting was not part of the record initially filed with the Court. Because of the importance of that proceeding, we directed, on our own motion, that it be added to the record. Md.Rule 1027.

the Bay Services bid bond was non-substantial and argued that "it just doesn't make sense to disqualify a low bidder for a $407 deficiency in a bond and cost the State $13,000." Kennedy, on the other hand, forcefully argued his case— that the statute was there, that it was clear, and that it ought to be applied uniformly—and he seemed clearly to understand that the final resolution of the matter was in the Board's hands. The Board was apparently unimpressed by Kennedy's argument, as it approved the contract with Bay Services that day, although it is not certain from the record when that decision was first communicated to Kennedy.[2]

On December 7, 1981, Kennedy called and left a message for Clinton requesting "the final decision of the Procurement Office." Clinton returned the call the next day and told Kennedy that as "I had not gotten an official protest from him so I didn't have to give him the final response." He added that Kennedy "should put it in writing and then I could quote the appropriate language from the procurement regulations that said this is the final decision of the Procurement Office."

Nothing further happened until December 21, 1981, when Kennedy wrote a letter to Clinton, stating, in relevant part:

"Confirming our previous conversation would you please advise in writing if your decision relative to my protest is final.

As you know I feel that Kennedy Temporaries was the lowest 'responsive' bidder and that Bay Services was deficient in the mandatory minimum requirements of the bid; namely, failure to post 'at least' five percent of the bid price.

\* \* \* \* \* \*

---

**2.** The Board did not announce its decision immediately after the presentations by Clinton and Kennedy. The record shows that on December 9, 1981—a week after the Board approved the contract— Mr. Clinton formally advised Bay Services of the Board's decision. A copy of his letter of that date was sent to Kennedy. From the colloquy at oral argument, it seems clear that Kennedy was apprised of the Board's decision before receiving the letter from Clinton.

Your prompt attention to this matter will be greatly appreciated." (Emphasis in original.)

Clinton received this letter on December 30, and responded immediately. He stated first that his recommendation that the contract be awarded to Bay Services, which had been approved by the Board of Public Works, as indicated in his letter of December 9, was his "final recommendation." He then stated:

"It is not clear to me whether your letter of December 21, 1981 is filed as a protest under Subtitle 10 of the Procurement Regulations. Assuming that your letter of December 21 is a protest, I do not believe it was filed in accordance with 21.10.02.03B. If your letter is not timely, you may be precluded from any further remedies. Without prejudice to our right to raise the issue of timeliness, I do wish to advise you in accordance with 21.10.02.08(3)A that: This is the final decision of the procurement officer. This decision may be appealed to the Maryland State Board of Contract Appeals. If you decide to make such an appeal, you must file written notice of appeal to the Appeals Board within fifteen days from the date you receive this decision."

Nothing further happened until January 15, 1982, when, by letter of that date, Kennedy appealed to the Board of Contract Appeals.[3] In his letter, he urged that Mr. Clinton had misapplied COMAR 21.06.02.03 (waiver of minor irregularities in bids) in that an irregularity could be regarded as "minor," and thus subject to waiver under that regulation only if the correction or waiver of it "would not be prejudicial to other bidders." He claimed that in other cases, he had been disqualified because of an inability to meet the five percent requirement exactly; and he felt that it was unfair "when one Procurement Officer can deny your bid as not meeting the minimum bid requirements while another Pro-

---

**3.** Kennedy's letter to the Board was dated January 15. It was not received, and the appeal was not actually docketed, until January 20, 1982.

curement Officer can take away your successful bid by waiving the same requirements."

In a decision rendered July 20, 1982—three weeks after the contract with Bay Services had been fully completed—the Board of Contract Appeals concluded that:

(1) Kennedy had failed to comply with COMAR 21.10.02.-02, requiring that a written protest be filed "not later than 7 days after the basis for protest is known or should have been known, whichever is earlier."

(2) That requirement, being procedural in nature, can be waived.

(3) Because Mr. Clinton had actual knowledge of Kennedy's ground of protest within the seven-day period, and because he "acted to resolve the dispute in the same manner as if he had received a written protest," he had effectively waived the formal requirements of COMAR 21.10.02.02; and the protest was therefore effectively filed.

(4) In excusing the deficiency in Bay Services' bid bond, Clinton acted in conformance with COMAR 21.06.07.02B. The bond exceeded the difference between the two bids and thus the deficiency could, under the regulation, properly be regarded as "non-substantial." The statute, however, art. 21, § 3–504, was explicit. Subsection (b) requires the bid bond to be "in an amount equal to at least 5 percent of the amount of the bid," and subsection (c) states that, if the invitation requires that a bid bond be provided, "a bidder . . . that does not comply shall be rejected." To the extent that COMAR 21.06.07.02B permitted the waiver of "non-substantial" deficiencies in bid bonds, it was inconsistent with that clear legislative mandate and therefore was void.

In light of those conclusions, the Board "sustained" Kennedy's appeal. The victory was an empty one, however, as the Board ultimately decided that: "[B]ecause of the nature of this procurement the desired services were required to be performed, in full, concurrent with these administrative proceedings. Accordingly, no effective administrative remedy is feasible."

Neither party was satisfied with the Board's decision and thus both appealed to the Circuit Court for Baltimore City. Kennedy complained about the Board's delay in arriving at its decision, arguing that the Board had all the information it needed by February 28, 1982, and that by not deciding the matter until July 20, 1982, it violated both the law and its own regulation. It sought as relief compensation for expenses associated with the preparation of its bid and "lost profits resulting from the State procurement officer awarding the contract to a non-responsive bidder." The Comptroller, on the other hand, challenged the Board's findings that the requirements of COMAR 21.10.02.02 (written protest within seven days) could be and were waived and that COMAR 21.06.07.02B (permitting waiver of non-substantial deficiencies) was void.

The court, though agreeing with the Comptroller that the Board of Contract Appeals had no authority to declare COMAR 21.06.07.02B invalid, nonetheless effectively affirmed the Board's decision. The court itself declared the regulation to be "an improper extension of the administrative authority of the Procurement Officer" and thus to be "null and void." It also found, however, that Kennedy's claim for damages was "barred by the doctrine of sovereign immunity."

The court's decision brought no more solace to the parties than that of the Board of Contract Appeals, and we therefore again have cross-appeals. Kennedy claims a right to damages by reason of the wrongful award to Bay Services, a right, it asserts, that is not barred by sovereign immunity. The Comptroller argues that (1) COMAR 21.06.07.02 is valid; (2) the requirements of COMAR 21.10.02.02 were not and cannot be waived; and (3) because Kennedy's bid was not accompanied by a proper bid bond, its bid was nonresponsive, as a result it could not have been awarded the contract even if Bay Services' bid was rejected, and it therefore has no standing to complain about the award to Bay Services.

### III. *Discussion*

#### A. *Precis*

We think that the Comptroller's third argument is valid; Kennedy does not qualify as a "responsive" bidder, and thus has no legal status to challenge the award to Bay Services. We believe, in addition, that, even if Kennedy were to be regarded as having such status, by failing to pursue his administrative remedy in conformance with the requirements of § 7–201, he has waived his right to complain.

Before discussing these two issues, which are dispositive of this case, we think that, in fairness to both parties, it should be noted that the 1980 procurement law and the regulations issued under it represented a wholesale rewriting of State procurement procedures. At the time the relevant events occurred here—October, 1981—January, 1982—those procedures were very new, having taken effect only the previous July 1; and neither State officials nor prospective contractors had had much experience in dealing with them. Moreover, despite the considerable amount of study and effort that went into the development of the law and the regulations, they are by no means free of ambiguity. *See* Report, *Ad Hoc Committee To Study Article 21—Procurement,* October 10, 1983.

The simple fact, though, is this. If a disappointed bidder expects to hold the State to strict and literal compliance with all of the procedural requirements of the procurement law, he too must comply with the law. In this case, Kennedy failed to do that.

#### B. *Kennedy's Standing As A Responsive Bidder* [4]

■ In Part II, above, we observed that Kennedy's bid was not accompanied by a bid bond. In place of such a bond, it submitted a letter from Maryland National Bank

---

4. The question of Kennedy's standing to complain about the award to Bay Services was raised but not decided in the circuit court. We shall exercise our discretion under Md.Rule 1085 and address it in this appeal.

guaranteeing "to provide any collateral necessary to the State of Maryland to be held as collateral against perform- ance," should Kennedy's bid be accepted.

Section 3–504(a), in stating the requirement of a bid bond, provides: "The bid bond shall be provided by a surety company authorized to do business in this State, or the equivalent in cash, or in a form satisfactory to the procure- ment officer." COMAR 21.06.07.01B expands upon that. It permits, as bid security, a surety bond, a bank check, or a "[p]ledge of securities backed by the full faith and credit of the United States government or bonds issued by the State of Maryland."

A bid bond is a very limited kind of performance bond. It is designed to assure only that a bidder, if success- ful, will, in fact, enter into the contract he has bid upon, and to provide a secure fund to compensate the State if he fails to do so. The condition of the bond is that the principal will "execute such further contractual documents, if any, and give such bond(s) as may be required by the terms of the bid. . . ." COMAR 21.06.07.03 (Exhibit E). *See Board of Education v. Allender,* 206 Md. 466, 476, 112 A.2d 455 (1955);[5] *Harran Transportation Co. v. Board of Ed.,* 71 Misc.2d 143, 335 N.Y.S.2d 971 (1972). Its function and its legal effect end once a contract is signed, for at that point the condition of the bond has been satisfied. As the Comp- troller points out, the loss accruing from the default by a successful bidder—*i.e.,* his failure to enter into the contract in accordance with his bid—is normally the difference be-

---

5. *Allender* involved a situation very similar to the one before us; the low bidder failed to comply with the bid security requirement, and a higher bidder insisted that the bid be rejected. Although the law required competitive bidding, the bid security requirement was not statutory, a fact the Court noted: "[W]here there has not been any violation of a statute or ordinance, an administrative agency, in determining who is the lowest responsible bidder, has a wide discre- tion which will not be controlled by the courts except for fraud, collusion, or arbitrary discrimination." 206 Md. at 475, 112 A.2d 455. Because the issue before us is one of statutory construction, the holding in *Allender* is not apposite.

tween what the State would have paid absent the default (usually the amount of the defaulter's bid) and what it actually has to pay as the result of the default (generally the next highest bid accepted by the State). That is what a bid bond is intended to secure; and indeed the guarantee of the surety is that, in the event of a default in executing a contract, "the Principal shall pay the State for any cost of procuring the work which exceeds the amount of its bid." COMAR 21.06.07.03 (Exhibit E).

█ The letter from Maryland National Bank does not, in our judgment, satisfy the bid bond requirement of the statute, the regulation, or the invitation to bid. In the first place, the pledge of collateral was against "performance" should Kennedy's bid be accepted, not specifically against loss occurring by virtue of a default in entering into the contract. Second, it is not clearly a pledge of securities backed by the full faith and credit of the United States or the State of Maryland. If, as Kennedy claims, Mr. Clinton was without authority to waive the $408 deficiency in Bay Services' bond, he surely was without authority to waive this type of deficiency.

### C. *Protest Requirements—Waiver*

The statutory provisions governing the resolution of disputes arising under the procurement law are, as we have said, found in § 7–201. Subsection (a) thereof provides, in relevant part, that "[u]pon timely demand, as defined in regulations . . ., by a . . . bidder . . . the responsible procurement officer of the using agency may, consistent with . . . all applicable laws and regulations, negotiate and resolve disputes relating to the formation of a contract with the State . . .", including disputes "concerning the qualification of bidders . . . and the determination of the successful bidder. . . ." Subsection (b) provides that the resolution of those disputes "shall be in accordance with regulations established by the respective departments, and the procurement officer's decision shall be in writing."

The process is more sharply defined in COMAR 21.10.02, which requires, among other things, that a protest "shall be in writing and addressed to the respective procurement officer representing the State agency" (21.10.02.02) and that where the basis of the protest is not apparent before the bid opening, "bid protests shall be filed not later than 7 days after the basis for protest is known or should have been known, whichever is earlier." (21.10.02.03).

Kennedy discovered the basis of his protest on November 23, 1981; to comply strictly with the regulation Kennedy should therefore have filed a written protest with Mr. Clinton by November 30.[6] That clearly was not done, and thus there can be no legitimate claim of compliance by Kennedy with the requirements of the regulation.

Kennedy's response is that, by taking cognizance of his complaint, Clinton effectively waived the seven-day-written-protest requirement, to which the Comptroller rejoins that Clinton had no legal authority to waive that requirement.

■ The requirement that a protest be in writing and that it be filed within seven days is both procedural and substantive. It is designed, at least in part, to govern internal agency procedures; but it also has a substantive impact upon other parties. A protest triggers the dispute-resolution process established in § 7–201, and that necessarily affects not just the agency and the protester, but the would-be successful bidder (and possibly other bidders) as well. His right to the contract is placed in jeopardy by the invocation of that process; and he certainly has an interest in knowing promptly (and within the time limit established

---

6. November 26, 1981, was Thanksgiving Day and November 28 and 29 were, respectively, Saturday and Sunday. As the required period did not exceed seven days, it may have been argued that those three days should be excluded, thus extending the period to December 3, 1981. *See* Md.Code Ann. art. 94, § 2; *Am. Tobacco Co. v. Strickling,* 88 Md. 500, 41 A. 1083 (1898); *Yerkes v. Board of Supervisors,* 140 Md. 455, 117 A. 772 (1922). Kennedy has made no such argument, however, and has not disputed the Comptroller's contention that the last day for filing a written protest was November 30.

by the regulation) whether he may be called upon to defend his bid. We also would note that, even if regarded as merely procedural in nature, the regulation was not that of the Comptroller. It was adopted by the Department of Budget and Fiscal Planning, with the approval of the Governor and the Board of Public Works, and was imposed by those agencies upon the Comptroller's office in the latter's capacity as a procurement agency. Whatever the procurement officer's authority might be to waive a procedural regulation of the Comptroller,[7] we find no authority in the law for him to waive a requirement externally imposed pursuant to clear statutory authority. Such a power would be inconsistent with the whole thrust and scheme of the law.

### D. *Effective Waiver*

Although, as indicated, we find that Kennedy failed to file a timely written protest, as required by regulation, we do not rest our determination of waiver solely on that finding. There was a more important lapse.

Despite the lack of a written protest, Clinton in fact entertained and rejected Kennedy's complaint; and through his letters of November 25 and 27 he clearly and unequivocally communicated his decision to Kennedy. When Kennedy appeared before the Board of Public Works on December 2, 1981, he was unmistakably aware that his complaint had been rejected by Clinton; he was aware as well from the very fact that Clinton had formally recommended that the Board award the contract to Bay Services that Clinton's rejection of his complaint was a final one; and he was aware

---

7. Quoting from *NLRB v. Monsanto Chemical Co.*, 205 F.2d 763, 764 (8th Cir.1953), the Supreme Court noted in *American Farm Lines v. Black Ball Freight Service*, 397 U.S. 532, 539, 90 S.Ct. 1288, 1292, 25 L.Ed.2d 547 (1970), that "[i]t is always within the discretion of a court or an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it." *See also Hopkins v. Md. Inmate Griev. Comm'n*, 40 Md.App. 329, 391 A.2d 1213 (1978); *Board of Educ. of A.A. Co. v. Barbano*, 45 Md.App. 27, 411 A.2d 124 (1980).

that the Board was likely to act upon the recommendation that day.

Yet, despite that posture of the matter, and knowing that there was less than a month left before the contract would have to be implemented, Kennedy not only gave the Board no indication of his intent to pursue the matter further but indeed waited until January 15, 1982, before finally noting an appeal to the Board of Contract Appeals.

■ The right of appeal to the Board of Contract Appeals can be waived, and we think that, by his inaction, Kennedy effected such a waiver in two respects.

■ Art. 21, § 7–201(d) requires that an appeal be taken "[w]ithin 15 days of receipt of notice of a final action disapproving a resolution or approving a decision not to resolve a dispute relating to the formation of a State contract. . . ." Given the informal manner in which Kennedy initially made and pursued his complaint, we think that he received the requisite notice by Clinton's letter of November 27, 1981. It was clear to him by then—if not earlier—that Clinton had finally rejected his complaint. If that was not enough, he was informed through Clinton's letter of December 9, 1981, that the Board of Public Works had also rejected the complaint. Yet he waited until January 15, 1982, to note an appeal to the Board of Contract Appeals, pretending in the meanwhile that he had not yet received Clinton's final decision.

We regard the communications between Kennedy and Clinton after December 2 as unnecessary and superfluous. It is clear that the fifteen-day period for appeal expired well before January 15.

■ In addition, as we observed in Part I, the various provisions of the procurement law dealing with the dispute-resolution procedure (§ 7–201) and the ultimate approval authority of the Board of Public Works (§ 2–101; art. 78A, § 1B) imply, if not dictate, that the dispute-resolution process be completed before a disputed matter is presented to the Board. That, necessarily, imposes reciprocal obligations, one on the procurement officer not to present the matter to

the Board until a known dispute is resolved, and one on a claimant to make clear to the Board, if a matter in dispute is presented to it, his intent to avail himself of the statutory remedy.

██ Aside from the fifteen-day requirement, we do not believe that a disgruntled bidder, however meritorious his claim, can knowingly appear before the Board of Public Works, give no indication of an intention to pursue a remedy under § 7–201, submit the merits of his claim to that Board and lead it to believe that it may properly decide the issue, and then, after the Board has acted and the contract is about to be implemented, throw everything into a cocked hat by waiting more than six weeks and then pursuing an appeal to the Board of Contract Appeals. That kind of inaction constitutes at least an implied waiver.

For all of these reasons, we conclude that Kennedy's appeal to the Board of Contract Appeals should have been dismissed. We shall remand the case to the Circuit Court for Baltimore City for entry of an order to that effect.

JUDGMENT VACATED;

CASE REMANDED TO CIRCUIT COURT FOR BALTIMORE CITY FOR ENTRY OF ORDER IN CONFORMANCE WITH THIS OPINION; APPELLANT (KENNEDY TEMPORARIES) TO PAY THE COSTS.