625 A.2d 361

## BOARD OF SCHOOL COMMISSIONERS OF BALTIMORE CITY

v.

## June F. JAMES.

## BOARD OF SCHOOL COMMISSIONERS OF BALTIMORE CITY

v.

## Carrie DAVIS.

Nos. 1553, 1554 Sept. Term, 1992.

Court of Special Appeals of Maryland.

June 3, 1993.

402

404

Eileen A. Carpenter, Principal Counsel, Baltimore, argued (Otho M. Thompson, Deputy City Sol. and Avery Aisenstark, Sp. Associate Sol., on the brief), for appellant.

Joel A. Smith, Baltimore, argued (Kahn, Smith & Collins, P.A., on the brief), for appellees.

Argued before WILNER, C.J., and MOTZ, J., and ROSALYN B. BELL, J. Retired (Specially Assigned).

MOTZ, Judge.

In each of these consolidated cases appellant, Board of School Commissioners of Baltimore City (the Local Board) appeals from a judgment of the Circuit Court for Baltimore City finding that Maryland State Board of Education (the State Board) erred when it upheld the Local Board's decision to discharge a teacher on the ground of incompetency.

(i)

Appellees, June Faye James and Carrie Davis (collectively, the teachers), were middle school teachers in the Baltimore City Public School System. Both received year-end evaluations for the school years 1988–89 and 1989–90 of "needs improvement." Richard C. Hunter, Superintendent of Public Instruction of the Baltimore City Schools, recommended to the Local Board that Ms. James and Ms. Davis be dismissed for incompetency. Separate two-day dismissal hearings were conducted in each case by a hearing examiner, who recommended, in each case, that the Local Board uphold the Superintendent's recommendation for termination. On December 6, 1990, the Local Board voted to accept the decisions of the hearing examiners and to uphold the recommendations of the Superintendent. Ms. James and Ms. Davis appealed that decision to the State Board. At the designation of the State Board, an administrative law judge held a de novo hearing in each case.

After considering the testimony of 5 witnesses (including Ms. James herself) and 11 exhibits over a two-day hearing, an

administrative law judge made the following findings of fact with regard to Ms. James, which we set forth verbatim:

(1) [Ms. James] has been a teacher in the Baltimore City School System since 1969.

(2) [Ms. James] began teaching at the Booker T. Washington Middle School at the beginning of school year 1986–87.

(3) [Ms. James] is an "elected" [tenured] teacher.

FINDINGS RELATED TO SCHOOL YEAR 1988–89.

(4) During school year 1988–89, [Ms. James] was late 49 times and absent on sick leave 96 days.

(5) On December 2, 1988, [Ms. James] received an "informal observation" from Warren K. Moore, Educational Specialist, Office of English/Language Arts.

(6) No formal evaluation of [Ms. James] was conducted during school year 1988–89.

(7) [Ms. James] received a final evaluation for school year 1988–89 of "needs improvement."

FINDINGS RELATED TO SCHOOL YEAR 1989–90.

(8) During school year 1989–90, [Ms. James] was late 69 times and was absent on sick leave on 33 days.

(9) In September, 1989, an Individualized Professional Assistance Plan for [Ms. James] was entered into by [Ms. James], her department head, the principal and the instructional specialist.

(10) The primary objectives of the Individualized Professional Assistance Plan were that, by December 1, 1989, [Ms. James] would have established the following: learning objectives consistent with appraisal of individual student needs and requirements of the curriculum framework, particularly in the area of written composition; an accurate, systematic, cumulative record of student achievement in the area of written composition; and, an appraisal of student learning levels, interests, and needs, particularly in the area of written composition.

(11) [Ms. James] failed to meet the objectives of the Individualized Professional Assistance Plan.

(12) [Ms. James] was formally observed on October 25, 1989, and on February 22 and March 20, 1990. The observation of October 25, 1990 was assessed as "good"; those of February 22 and March 20, 1990 were assessed as "satisfactory."

(13) [Ms. James] received a "satisfactory" evaluation on November 21, 1989.

(14) [Ms. James] received a "needs improvement" evaluation on March 27, 1990.

*James v. Board,* decision of Administrative Law Judge Guy J. Avery, dated December 4, 1991 (citations to record before administrative law judge omitted).

The administrative law judge concluded

The evidence shows that [Ms. James's] performance as a teacher during school years 1988–89 and 1989–90 was not up to professional standards. Not only did she receive ... "needs improvement" final evaluations for both school years, she was also late on an excessive number of occasions. Moreover, she failed to comply with the provisions of the Individualized Professional Assistance Plan to which she had agreed.

*Id.* The administrative law judge, however, determined as a matter of law that the Local Board violated [Ms. James's] right to due process

in that the full record of the proceeding before its hearing examiner was not reviewed by the Board of School Commissioners of Baltimore City and [Ms. James] was not given an opportunity to present argument before the Board of School Commissioners of Baltimore City.

I further conclude, as a matter of law, that the Board of School Commissioners of Baltimore City failed to comply with its own procedures in seeking to discharge the Appellant and that, as a result, the Statement of Charges cannot be sustained.

*Id.* For these reasons, the administrative law judge recommended

(1) The decision by the Baltimore City Board of School Commissioners to discharge [Ms. James] should be REVERSED by the State Board.

(2) [Ms. James] should be reinstated with full pay and benefits effective December 6, 1990.

*Id.* The administrative law judge further recommended that in the event the State Board should choose to discharge Ms. James the discharge "be made effective the date of the State Board's Order." *Id.*

The case was argued before the State Board. The State Board adopted the findings of fact of the administrative law judge and the local hearing examiner, but concluded, upon its independent review of the record, to reject the administrative law judge's recommendation. The State Board determined that the failure of the Local Board to comply with the requirements for a transcript and oral argument were procedural errors, cured by the State Board's *de novo* review and the opportunity for oral argument before the State Board. It found the failure to have a formal evaluation by a non-school-based observer during the 1988–89 year was not a "fatal error" because the "primary purpose" of the Baltimore City evaluation procedures is to "improve instruction and to encourage growth in professional ability and responsibility on the part of the staff" and "*not* to confer procedural benefits upon teachers...." (emphasis in original). Finally, the State Board concluded that there were "sufficient undisputed facts in [the] record to sustain dismissal on the ground of incompetency," *i.e.*, "Ms. James'[s] failure to have lesson plans, unit outlines, and emergency lesson plans; her failure to submit a quarterly grade distribution sheet; her failure to meet the objectives of the individualized professional assistance plan developed for her in 1989 including her failure to maintain an accurate, systematic, cumulative record of student achievement in the area of written composition; her failure to have learning objectives consistent with the appraisal of individual

student needs and the requirements of the curriculum framework; and the high failure rate of her students."

Ms. Davis's case was heard by a different administrative law judge. After considering the testimony of 6 witnesses (including Ms. Davis) and 28 exhibits over a two-day hearing, that administrative law judge recommended that the State Board grant Ms. Davis's motion to dismiss "the action of the [L]ocal [Board]." *Davis v. Board,* decision of Administrative Law Judge Laurie Bennett, dated October 17, 1991. The administrative law judge determined that any violations of Ms. Davis's due process rights caused by the Local Board's procedural errors in hearing this matter were cured by *de novo* review by the State Board. *Id.* The administrative law judge nevertheless concluded that Ms. Davis's motion should be granted because the Local Board "failed to confer upon [Ms. Davis] an important procedural benefit," in that her 1988–89 year end evaluation did not contain an observation by an non-school-based observer as specified in the Baltimore City school procedures. *Id.*

Ms. Davis's case was also argued before the State Board. The State Board, based upon its independent review of the record, rejected the proposed decision of the administrative law judge and adopted the findings of fact of the local hearing examiner. The local hearing examiner had found *inter alia* that: [1]

(1) Ms. Davis had been a teacher in the Baltimore City School System since 1968.

(2) She taught in the Winston Middle School in school year 1988–89; and in the Booker T. Washington Middle School in school year 1989–90.

FINDINGS RELATED TO SCHOOL YEAR 1988–89.

(3) There is "no question that Ms. Davis was absent a lot" during the 1988–89 school year.

---

**1.** Only the material in quotation marks is verbatim quotation from the hearing examiner's opinion. Her findings were not numbered; numbers have been supplied for reading ease.

(4) Ms. Davis was formally and informally observed on several occasions during the 1988–89 school year.

(5) Ms. Davis was not observed by a non-school-based observer during the 1988–89 school year. She was assessed as "good" in one formal observation and "satisfactory" in another although in the latter she was assessed as "needs improvement" in one criterion because "her skills in writing lesson and long range plans were weak." Her math department head observed Ms. Davis informally "throughout the school year," her "assessment was that she would not want Ms. Davis to teach her child."

(6) Ms. Davis's final evaluation for school year 1988–89 was "needs improvement," because *inter alia* "she did not have her unit plans when ... [they] were requested at the pre-observation conference," "she skipped a problem-solving unit and did not teach problem solving." There was "sufficient evidence ... [t]he students were not being taught because of her admitted lack of knowledge in a given area, and she did not pursue her need for assistance or further education in order to meet the educational needs of her students."

FINDINGS RELATED TO SCHOOL YEAR 1989–90.

(7) During school year 1989–90, Ms. Davis had "poor attendance."

(8) In September 1989, Ms. Davis, her principal, her department head, and the instructional specialist met to discuss implementation of an Individual Professional Assistance Plan for Ms. Davis.

(9) Ms. Davis was formally observed four times during the 1989–90 school year. She was observed on October 26, 1989 and was "rated as satisfactory." She was observed on December 19, 1990 and assessed as "needs improvement," with a concern that she was teaching "by r[o]te rather than teaching the concept." Ms. Davis was observed on February 15, 1990 and was assessed as "satisfactory." Finally, Ms. Davis was observed on March 29, 1990 and received a "needs improvement" evaluation.

(10) In addition, Ms. Davis was observed informally on numerous occasions by three different people; two of them, including her principal, assessed her as "needs improvement" during most of these observations.

(11) Ms. Davis "had a 42.4 percent failure rate for students in her classes." On January 31, 1990, her principal "gave Ms. Davis recommendations to develop some strategies to determine why students were failing." Ms. Davis "did not submit her quarterly grade distribution sheet" which concerned her principal; "she wrote the same lesson plan for 5 different classes without a differentiation of instruction . . . and there were no test or quiz grades recorded after February 2, 1990." Ms. Davis "did not have a grade book." "She did not have emergency lesson plans, she was not teaching her class when she was in the building, poor attendance on her behalf. . . ."

(12) "Ms. Davis continued some of the same patterns and practices that were evidenced [in the 1988–89 school year] at Winston Middle School. Most importantly, if she was interested in teaching, she had to be present. The students have to be motivated by a teacher who is on duty in all respects of the word. In formal observations she did satisfactory, excluding, of course, Principal Bukatman's formal observation marked 'Needs Improvement'. In informal observations, she did not do as well."

Opinion of Hearing Examiner Patricia E. Butler.

The State Board again determined that the failure of the Local Board to comply with the requirements for a transcript and oral argument were procedural errors, cured by the State Board's *de novo* review and the opportunity for oral argument before the State Board. It found the failure to have a non-school-based observer during the 1988–89 year was not a "fatal error" because the "primary purpose" of the Baltimore City procedures of teacher evaluation is "to improve instruction and to encourage growth in professional ability and responsibility . . . . of the staff" and "*not* to confer procedural benefits upon teachers. . . ." (emphasis in original). Finally, the State Board found "sufficient undisputed facts in [the]

record to sustain dismissal on the ground of incompetency," *i.e.*, Ms. Davis's "failure to teach the problem-solving unit; her lack of understanding and failure to present correctly the order of operations; her failure to have unit plans and emergency lesson plans; her failure to record grades; her failure to keep an accurate roll book; and the high failure rate of her students."

Both Ms. James and Ms. Davis appealed the State Board decisions to the Circuit Court for Baltimore City, where the cases were consolidated. The circuit court reversed, reasoning:

> [T]his case is more like *Ballard* than any of the other cases; that these ladies have been in the system for a long time; have been tenured, and this is a clear question of law.
>
> The charges that were brought were brought for two successive years. The State is bound by that and it is probably a requirement because the philosophy of our educational system is to attempt to evaluate, number one; and number two, improve, if necessary. So it would have to, by its own necessity, be a two-year process.
>
> In any event, the Court, in applying the law, believes that the law is quite simple, and that is in this particular case there are procedures that the Board of Education is obligated to follow that they did not follow, and taking all things in these transcripts, as well as papers that are filed, I am going to adopt the argument of the Appellants, and for those reasons stated in the argument, not to mention the due process, which is an additional observation of the Court, but not as strong as the original argument under 6–202 and 203 in the procedure here.
>
> So that being the case, the Court will reverse the decision of the Board in both the James case as well as the Davis case. . . .

The circuit court ordered that the Local Board "immediately restore" Ms. James and Ms. Davis "to the employ of the Baltimore City Public Schools as . . . tenured teacher[s]" and

pay them "all wages and benefits to which [they] would have been entitled had [they] not been dismissed."

On appeal the Local Board raises four questions with regard to each teacher:

1. Did the Circuit Court fail to apply the appropriate standards of review when it reversed the Maryland State Board of Education?

2. Did the Circuit Court err when it reversed the dismissal for incompetency for lack of a formal observation by a non-school-based observer for the 1988–89 evaluation?

3. Did the de novo hearing at the State level cure any procedural defects?

4. Did the Circuit Court fail to recognize the board visitatorial powers granted the State Board under the Education Article?

Ms. James counters with the following five questions:

1. May a Circuit Court substitute its judgment for that of the Maryland State Board of Education when it decides as a matter of law that the State Board incorrectly read the meaning and purpose of a written rule or regulation that was adopted by a local board of education?

2. Was the local board's action, to dismiss June James, contrary to law because the local board failed to strictly comply with its own rules and regulations as to the evaluation, discipline and dismissal of tenured teachers?

3. Is the Maryland State Board of Education authorized under Md.Ed.Code Ann. Sec. 6–202(a)(1) to decide the merit of the dismissal of a tenured teacher as it would have charged the teacher rather than as the teacher was charged by a local board of education?

4. Was the action of the Maryland State Board of Education in the case of June James consistent with the standards set by the State Board in its published opinion of *Avery v. Board of Education of Baltimore County,* 4 Op. of MSBE 10 (1985)?

5. Was the decision to dismiss June James in any way rendered infirm by the fact that the Board of School Commissioners did not grant James the statutory due process to which she is entitled under Md.Ed.Code ann. Secs. 6–203(d), (e) & (f)?

Ms. Davis seeks to adopt questions 1, 2, 3, and 5 raised by Ms. James and raises two additional questions:

1. In a contested case, may an administrative agency propound findings of fact and conclusions of law on issues that are not reached by an Administrative Law Judge because the Law Judge ruled on a motion to dismiss and found it unnecessary to reach the merits?

2. Was the State Board arbitrary in that it failed to discuss or articulate in any way in its written decision whether the Individualized Assistance Plan prepared for Carrie Davis was commensurate with her needs?

(ii)

The first question presented by all parties concerns the appropriate standard of review of the State Board's decisions upholding the Local Board's decision to discharge Ms. James and Ms. Davis because of incompetency; the Local Board's fourth question concerns the related question of whether the powers of the State Board were properly recognized by the circuit court. Although the parties devote a substantial amount of attention to these points, on analysis it is clear that they agree on virtually all of the governing legal principles.

The Maryland Code specifically provides that a teacher can be dismissed by a local board for incompetency:

(1) On the recommendation of the county superintendent, a county board may suspend or dismiss a teacher ... for:

. . . .

(iv) Incompetency

(4) The individual may appeal from the decision of the county board to the State Board.

Md.Code (1957, 1992 Repl.Vol.), § 6–202(a)(1) and (4) of the Educ.Art.[2]

■ Moreover, the teachers concede it is so well established that the State Board is "vested with the last word on matters of educational policy and administration of public education in Maryland" that this "doctrine dates back more than 100 years." This is not an overstatement. In *Wiley v. Board of County School Comm'rs of Allegany County*, 51 Md. 401 (1879), the Court of Appeals described the State Board's power in this way:

> This is a visitatorial power of the most comprehensive character ... If every dispute or contention among those entrusted with the administration of the system, or between the functionaries and the patrons or pupils of the schools, offered an occasion for a resort to the courts for settlement, the working of the system would not only be greatly embarrassed and obstructed but, such contentions before the court would necessarily be attended with great costs and delays, and likely generate such intestine heats and divisions as would, in a great degree, counteract the beneficent purposes of the law.

*Id.* at 406.

■ Nor have the years in any way diminished this power. In *Board of Educ. of Prince George's County v. Waeldner*, 298 Md. 354, 470 A.2d 332 (1984), the Court addressed the authority of the State Board in the precise situation presented here:

> The scope of the State Board's authority under Section 6–202(a)(4) to hear an "appeal" from the "decision" of the County Board in cases involving the suspension or dismissal of a teacher must be ascertained in light of the broad visitatorial powers vested in the State Board under the

---

2. Although § 6–202 refers to the "county superintendent" and "county board," "county superintendent" and "county board" are defined in another portion of the Education Article to include respectively, the Superintendent of Public Instruction of Baltimore City and the Board of School Commissioners of Baltimore City. § 1–101(d) and (e) of the Educ. Art.

Education Article. *See Board of Educ., Garrett Co. v. Lendo,* 295 Md. 55, 64, 453 A.2d 1185 (1982). In our view, the legislature did not intend that the State Board's review of the County Board's action in such cases would be restricted to mere determination on the record made before the County Board of whether there was competent and substantial evidence to support that agency's factual determination. On the contrary, we think it evident from the statutory scheme of the Education Article, and the allocation of powers between the State and County Boards, that the legislature intended that the State Board would exercise its independent judgment on the record before it in determining whether disciplinary infractions, as charged, had been established and, if so, whether the sanction imposed was too severe under the circumstances. Otherwise stated, under its visitatorial power, the "last word" or the "final decision" rests with the State Board as to any dispute concerning the administration of the public school system, including whether under Section 6–202(a), teacher misconduct warrants dismissal or a lesser sanction.

*Waeldner,* 298 Md. at 361, 470 A.2d 332. (internal footnote omitted.) Thus, the State Board's "reviewing authority" of the dismissal decisions of a local board is not "narrowly focused, as in judicial review decisions under the Administrative Procedure Act...." *Id.* at 362, 470 A.2d 332.

On the other hand, the ultimate decision of the State Board is subject only to "judicial review under the Administrative Procedure Act." *Id.* at 362–363, 470 A.2d 332; *Strother v. Board of Educ. of Howard County,* 96 Md.App. 99, 623 A.2d 717 (1993). In reviewing the State Board's decision then, a reviewing court must determine if there is "substantial evidence" to support the Board's findings. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Anderson v. Dep't of Pub. Safety & Correctional Servs.,* 330 Md. 187, 623 A.2d 198 (1993); *Caucus Distribs., Inc. v. Maryland Sec. Comm'r,* 320 Md. 313, 324, 577 A.2d 783 (1990); *State Election Bd. v. Billhimer,* 314 Md. 46, 58, 548 A.2d 819, (1988) *cert. denied,*

490 U.S. 1007, 109 S.Ct. 1644, 104 L.Ed.2d 159 (1989). In applying the substantial evidence test, a court is not to substitute its judgment for the expertise of an agency, rather "the test is a deferential one, requiring 'restrained and disciplined judicial judgment so as not to interfere with' the [State Board's] 'factual conclusions.'" *Caucus*, 320 Md. at 324, 577 A.2d 783, quoting, *Supervisor v. Asbury Methodist Home*, 313 Md. 614, 625, 547 A.2d 190 (1988). This deference applies not only to the agency's fact-finding, "but to the drawing of inferences from the facts as well." *Caucus*, 320 Md. at 324, 577 A.2d 783; *St. Leonard Shores Joint Venture v. Supervisor*, 307 Md. 441, 447, 514 A.2d 1215 (1986). Accordingly, as long as the agency's decision "is not predicated solely on an error of law," a reviewing court "will not overturn it if a reasoning mind could reasonably have reached the conclusion reached" by the State Board. *Caucus*, 320 Md. at 324, 577 A.2d 783. This means, of course, that the State Board's authority, as even appellant concedes, is not unlimited. The State Board "cannot finally decide pure questions of law." *Wilson v. Board of Educ. of Montgomery County*, 234 Md. 561, 565, 200 A.2d 67 (1964). With the appropriate standard of review in mind, we turn to the substantive questions presented in this case.

(iii)

The first of these involves the circuit court's conclusion that there were "procedures" that the Local Board was "obligated to follow that [it] did not follow" prior to terminating the teachers. The "procedures" referred to are set forth in a document entitled the "Baltimore City Public Schools Procedures for Evaluation of Teaching Staff," (the "Procedures"). The Procedures provide for a system of evaluation of teachers using classroom observations. The Procedures state *inter alia* that:

> *At least one observer must be other than school-based if a* rating of *Unsatisfactory* or *Needs Improvement* is given

. . . .

> —Any teacher evaluated as *Unsatisfactory* or *Needs Improvement must have been observed by the principal and a qualified staff member other than school-based staff.*

. . . .

> *Observers are to hold a pre-observation conference* with a teacher in order to discuss the purposes of the observation

. . . .

> *Observers are required to hold a post observation* conference within ten (10) working days.

(italics in original; underlining added.)

During the 1988–89 school year, Ms. Davis was not observed by a non-school-based staff member. During the same year, Ms. James was not accorded pre-observation or post-observation conferences before or after any observation. During the 1989–90 school year, Ms. James and Ms. Davis each received observations, complete with pre-observation and post-observation conferences, by school-based and non-school-based personnel. Thus, it is uncontroverted that the "needs improvement" evaluation given to both teachers at the conclusion of the 1988–89 school year was not made in accordance with the Procedures but that the "needs improvement" evaluation given to both teachers at the conclusion of the 1989–90 school year was entirely in accord with the Procedures.

Nevertheless, the teachers maintain that the purpose of the Procedures is to afford them procedural benefits and "substantive guarantees" and so the failure of the Local Board to follow the Procedures prior to the 1988–89 year-end evaluation means that the Local Board's decision to discharge them must be reversed. This is so, they argue, regardless of the fact that this defect caused them no prejudice. In contrast, the Local Board asserts, and the State Board found, that the purpose of the Procedures was an internal administrative one, *i.e.*, to improve instructional ability, professional ability and responsibility on the part of the staff, "*not* to confer procedural

benefits." (emphasis in original). For this reason, the State Board determined with regard to each teacher that it did "not find the failure to have a non-school based observer during the 1988–89 year a fatal error." The State Board reasoned:

As stated in paragraph 2 of the Baltimore City Public Schools Procedures for Evaluation of Teaching Staff, the primary purpose of teacher evaluation is "to improve instruction and to encourage growth in professional ability and responsibility on the part of the staff." Because the primary purpose of the evaluation procedures is *not* to confer procedural benefits upon teachers, the failure to have a non-school based observer during the 1988–89 year does not automatically mandate reversal.

(emphasis in original).

 Determination of this question is assertedly important because of the "*Accardi* doctrine," *i.e.*, generally federal administrative agencies must follow their own rules, and if they do not, the resulting agency action is invalid; no showing of prejudice by the complaining party is necessary. *United States ex rel Accardi v. Shaughnessy*, 347 U.S. 260, 268, 74 S.Ct. 499, 503, 98 L.Ed. 681 (1954). *See also Morton v. Ruiz*, 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (1974); *Vitarelli v. Seaton*, 359 U.S. 535, 539–40, 79 S.Ct. 968, 972–73, 3 L.Ed.2d 1012 (1959); *Service v. Dulles*, 354 U.S. 363, 388, 77 S.Ct. 1152, 1165, 1 L.Ed.2d 1403 (1957). The federal courts have recognized, however, that the *Accardi* doctrine is not limitless; for example, an agency's failure to follow mere "internal administrative procedures" does not require reversal of an agency's action unless the complaining party can show substantial prejudice. *See American Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 539, 90 S.Ct. 1288, 1292, 25 L.Ed.2d 547 (1970). Similarly, a failure to comply with a published statement of "policy," *United States v. Fitch Oil Co.*, 676 F.2d 673, 676 (Temp.Emer.Ct.App.1982), or "internal documents" to guide employees, *Gatter v. Nimmo*, 672 F.2d 343 (3d Cir.1982), or agency "guidelines," *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707 (8th Cir.1979), has been held

not to invalidate agency action, absent a showing of prejudice. Determination of whether a federal regulation is a legislative rule, on one hand, or internal procedure, on the other hand, "turns" on whether it "affects individual rights and obligations" and whether the agency intended the rule to be legislative as "evidenced by such circumstantial evidence as the formality that attended the making of the law, including the rule making procedure and publication." Peter Raven–Hansen, *Regulatory Estoppel: When Agencies Break Their Own "Laws"*, 64 Tex.Law Rev. 1, 16 (1985) and numerous cases cited therein. *See also, Waverly Press v. Dep't of Assess. & Tax.*, 312 Md. 184, 191–2, 539 A.2d 223 (1988); 2 Kenneth Culp Davis, *Administrative Law Treatise* §§ 7:8–7:21 (2d ed. 1979) (1989 Supp.).

We have twice considered very similar arguments in the context of school staff dismissals. In *Board of Educ. of Anne Arundel County v. Barbano*, 45 Md.App. 27, 411 A.2d 124 (1980), we held that the primary purpose of the State Board's "resolved," but not officially "adopted," "Guidelines for the Evaluation of Probationary Teachers" was not to confer a procedural benefit on probationary teachers but "the obtention of good teachers and the prevention of bad ones," and so violation of those evaluation guidelines did not require reversal of the decision to terminate a probationary teacher. *Id.* at 40. Six years later, in *Board of Educ. of Baltimore County v. Ballard*, 67 Md.App. 235, 507 A.2d 192 (1986), we concluded, however, the primary purpose of an officially promulgated personnel regulation of the Local Board for "penalizing or terminating" tenured teachers was to confer important procedural benefits on those teachers. Thus, violation of these regulations by the local board required, pursuant to the *Accardi* doctrine, reversal of its decision to terminate a tenured school librarian. *Id.* 67 Md.App. at 243, 507 A.2d 192.

We note at the outset that, like the regulations in *Ballard* and unlike the guidelines in *Barbano*, the Procedures apply not to probationary teachers but to tenured employees.

Moreover, unlike the guidelines in *Barbano*,[3] there is no history of interpretation of the Procedures indicating their intent is not to confer procedural benefits. Indeed, the Local Board and its hearing examiners did not even interpret the Procedures or opine as to their purpose in the cases at hand; apparently, no argument as to the purpose of the Procedures was made at the Local Board level. On the other hand, there is no "regulatory history" indicating that the Procedures were designed to confer procedural benefits. The State Board specifically found that the purpose of the Procedures was to improve instruction and professional ability and *not* to confer procedural benefits. This, contrary to the Local Board's argument, is not a factual finding, which must be affirmed if based on substantial evidence, but the State Board's interpretation of the rule of a local board of education. Since the Procedures were not formulated by the State Board, its interpretation is not entitled to the deference accorded its interpretation of its own rules. *Compare Barbano*, 45 Md. App. at 31, 411 A.2d 124. Yet, in view of the State Board's broad visitatorial power and clear expertise in this area, when, as here, a local board's procedure involves or implicates the administration of public school policy, the State Board's interpretation as to the purpose of that procedure is entitled to deference.

We also note that, although the rules at issue here, like those in *Ballard*, are "procedures," their purpose and language seem far closer to that of the *Barbano* "guidelines." Thus, the Procedures are titled:

Baltimore City Public Schools

Procedures for Evaluations of Teaching Staff

The *Barbano* "guidelines" were very similarly titled:

---

**3.** In *Barbano*, we based our conclusion as to the purpose of the guidelines largely on review of prior pronouncements on this point by the body that issued the guidelines, the State Board. *See Barbano*, 45 Md.App. at 39–41, 411 A.2d 124.

Guidelines for the Evaluation of Probationary Teachers *Id.* 45 Md. at 30, 411 A.2d 124. In contrast, the mandatory *Ballard* regulations were titled:

Procedure for Penalizing or Terminating

Teachers on Tenure Whose Work is

not Satisfactory

*Ballard,* 67 Md.App. at 237, 507 A.2d 192. Moreover, and perhaps more significantly, the language of the Procedures, unlike that of the mandatory regulations in *Ballard,* is not " 'unambiguous, mandatory language' which makes clear that its purpose is to confer 'important procedural benefits and safeguards' upon tenured teachers." *Id.* at 243, 507 A.2d 192. Rather, although the Procedures clearly indicate that they are to be used to assess competency and in this process "[n]o indicator is to be considered optional," the stated purpose of the Procedures is an administrative one, *i.e.,*

The function of the Baltimore City Public Schools is to educate the children and adults enrolled. The procedures outlined below are designed to bring about the evaluation of the effectiveness of the teaching staff. . . . The *purpose of teacher evaluation is to improve instruction and to encourage growth in professional ability and responsibility on the part of the staff.*

(emphasis added).

Further, while the regulations involved in *Ballard* and even in *Barbano* were clearly directed at "non-renewal," *Barbano,* 45 Md. at 33, 411 A.2d 124, or "retirement," "resignation" or "terminat[ion]" for unsatisfactory work, *Ballard,* 67 Md.App. at 237, 507 A.2d 192, the Procedures are directed entirely at "evaluation" and nowhere mention "non-renewal," "retirement," "resignation," "dismissal," "termination" or the like. Finally, although the mandatory *Ballard* regulations were properly promulgated by a local board pursuant to its rulemaking authority under § 4–107(4) of the Educ. Art., *Ballard,* at 237, 507 A.2d 192, it appears that the Procedures, although unquestionably issued under the auspices of the Superinten-

dent, were not officially promulgated rules of the Local Board. *See Barbano,* 45 Md.App. at 31, 411 A.2d 124. Indeed, the teachers themselves consistently refer to the Procedures not as a rule, but as a "circular." [4] In *Barbano,* we held that the fact that guidelines were not officially promulgated meant that they had "neither the force nor the effect of law." *Id.* at 31, 411 A.2d 124.

Thus the title, stated purpose, and effect of the Procedures and the finding by the State Board that their primary purpose was "*not* to confer procedural benefits," as well as the fact that there is no evidence that they were officially promulgated, lead us to conclude the State Board was correct in finding that the violations of the Procedures in the 1988–89 year did not "automatically mandate reversal" of the decisions to terminate Ms. James and Ms. Davis at the end of the 1989–90 year. [5]

---

**4.** Union representatives testified that this circular was "developed around 1981"; however, there was no evidence—one way or the other—as to whether the Procedures were ever promulgated by the Local Board, pursuant to its rulemaking authority under § 4–107(4) of the Educ. Art.

**5.** *The Accardi* doctrine may not even be relevant here. Although its source was once thought to be the constitutional right to due process, the modern view seems to be that it is simply a principle of federal administrative law, *see, e.g., United States v. Caceres,* 440 U.S. 741, 752–753, 99 S.Ct. 1465, 1471–72, 59 L.Ed.2d 733 (1979); *Vitarelli,* 359 U.S. at 547, 79 S.Ct. at 976 (Frankfurter, J. concurring in part and dissenting in part) (*Accardi* is a "judicially evolved rule of administrative law") and so state courts are free to adopt the doctrine, or not, as they choose. As indicated above, this Court has on several occasions embraced the *Accardi* doctrine. *See Ballard,* 67 Md.App. at 240–41, 507 A.2d 192; *Maryland Nat'l Cap. Park & Planning Comm'n v. Friendship Heights,* 57 Md.App. 69, 81, 468 A.2d 1353 (1984); *Williams v. McHugh,* 51 Md.App. 570, 444 A.2d 475 (1982); *Barbano,* 45 Md.App. at 35–36, 411 A.2d 124; *Hopkins v. Maryland Inmate Griev. Comm'n,* 40 Md.App. 329, 335, 391 A.2d 1213 (1978). *But see Resetar v. State Bd. of Educ.,* 284 Md. 537, 547–550, 399 A.2d 225, *cert. denied,* 444 U.S. 838, 100 S.Ct. 74, 62 L.Ed.2d 49 (1979) (teacher urged Court to follow *Vitarelli*—one of the *Accardi* cases—to hold a local board was "bound by its own regulations," *see* Reply Brief at 19; Court of Appeals did not discuss *Accardi* or *Vitarelli* but declined to follow them in view of the fact that, as here, the teacher "suffered no prejudice" and "no penalty" was provided for violation of regulation).

(iv)

██ Both teachers also assert that the State Board's decisions "overstepped the bounds of the charging document[s] and thus [are] defective." The teachers claim that two errors resulted from this "overstepping." First, they briefly assert that the charges provided them with insufficient notice. The Statement of Charges prepared for Ms. James provides:

Richard C. Hunter, Superintendent of Public Instruction, does hereby recommend to your Honorable Board, pursuant to Maryland Annotated Code (1978, 1985 Replacement Volume) Section 6–202, the immediate and timely dismissal, of June James, Teacher at Booker T. Washington Middle School # 130, for incompetency in that—

1. The 1988–89 year end rating for [Ms.] James dated May 26, 1989 was rated as "needs improvement".

2. The 1989–90 year end rating for [Ms.] James dated March 27, 1990 was rated as "needs improvement".

The Statement of Charges prepared for Ms. Davis similarly provides:

Richard C. Hunter, Superintendent of Public Instruction, does hereby recommend to your Honorable Board, pursuant to Maryland Annotated Code (1978, 1985 Replacement Volume) Section 6–202, the immediate and timely dismissal of Carrie Davis, Teacher at Booker T. Washington Middle School # 130, for incompetency in that—

1. The 1988–89 year end rating for Ms. Davis dated May 30, 1990 was rated as "Needs Improvement"

2. The 1989–90 year end rating for Ms. Davis dated March 29, 1990 was again rated as "Needs Improvement"

Of course the teachers are entitled to notice of the charges against them. Here, however, they were given notice of the charges, i.e., recommended dismissal "for incompetency"—and never claimed below that the notice was inadequate. Accordingly, their brief assertion in this Court of lack of notice is not preserved for appellate review.

Even if it was preserved, the argument appears not to be meritorious. The purpose of notice, of course, is to provide a party with adequate knowledge of the reasons for the action being taken against her. Prior to the formal Statements of Charges, Ms. James and Ms. Davis were not only observed—formally and informally—for some time and attended several post-observation conferences but also each was supplied with a several page formal evaluation form at the end of 1988–89 and 1989–90 school years, which contained detailed comments from Ms. Davis's and Ms. James's principal. Ms. James's principal explained in the 1990 year-end evaluation form, which was provided to Ms. James 6 weeks prior to the Statement of Charges, that Ms. James's "release" was recommended because:

. Ms. James has flagrantly and consistently failed to adhere to the implementation steps of her professional assistance plan as documented by Jude Pasquariello, instructional specialist, F. Michel Vaeth, Language Arts department head, and the principal. Based on the principal's 2/22/90 examination of Ms. James'[s] unit and lesson plans, and grade book, Ms. James does not write unit plans, wrote only 18 lesson plans since the beginning of the school year, and recorded only one grade in her grade book for the third quarter which began on 1/25/90.

Ms. James has failed to submit lesson plans as prescribed in her assistance plan to her department head in their weekly meetings. She has failed to provide the mandated writing experiences designed to teach students the writing process and has failed to maintain students' writing samples in the required writing folders provided by B.C.P.S. She has failed to keep an up-to-date record of student progress in her grade book following a student failure rate of 42.4% second quarter.

Ms. James continues to fail to provide the administrator with emergency lesson plans even though her chronic illness has resulted in several absences of many days. Roll book examinations revealed missing required documentation which still exists. Ms. James has had to receive as many as

three requests prior to submitting quarterly grade distribution sheets to the principal. She also fails to accurately complete grading sheets for automated grading.

Similarly, Ms. Davis' principal explained on her 1990 year-end evaluation form, which was provided to Ms. Davis six weeks prior to the issuance of the Statement of Charges, that Ms. Davis' release was recommended because:

> Ms. Davis has failed to consistently demonstrate a level of competence in the subject matter adequate for her present teaching assignment. In response to a conference held at Ms. Davis'[s] request and attended by the mathematics department head, the principal and B.T.U. representative Neil Ross, on 1/26/90, it was suggested again (see observation of 12/19/89) that Ms. Davis enroll in a methods of teaching mathematics course to renew her skills. Her response to the principal was "are you going to pay for it?"

> A conference was held on 9/7/89, attended by the department head, Mr. Wilson, the instructional specialist, Mary Dubsky, the principal and Ms. Davis to develop and sign Ms. Davis'[s] professional assistance plan. During the conference the principal inquired about Ms. Davis'[s] absences on 9/5 and 9/6, the first two days of school for students. Ms. Davis'[s] response was, "I did not feel like to coming to work."

> To date, Ms. Davis has had 6 occasions of absence. However she has had 20 full days of absence plus 20 half days of absence. The 20 half day additional absences, however, are due to clinic appointments resulting from a fall she had on the way to the restroom on 1/8/90.

 It appears to us that these explanations, combined with the formal Statements of Charges, provided the teachers with ample notice of the charges against them. The only case upon which the teachers rely in making their argument to the contrary that involves a teacher's dismissal is *Underwood v. Board of County School Comm'rs of Prince George's County*, 103 Md. 181, 63 A. 221 (1906). There, the teacher was given *no* notice of the reason for her dismissal; the Local Board

simply notified a teacher that her "services" were no longer "required." *Id.* at 184, 63 A. 221.[6] That situation is very different from the case at hand. Here, the teachers were provided with written and oral comments over a two year period, culminating in the written explanations of the 1990 year-end evaluations set forth above. Moreover, the Statements of Charges themselves clearly told the teachers precisely the statutory basis for their dismissal, *i.e.*, "for incompetency"; similar notices have been used and approved in the past. *See, e.g., Board of Educ. of Charles County v. Crawford,* 284 Md. 245, 247, 395 A.2d 835 (1979) (charge merely notified the teacher that it was recommended that she "be dismissed on the grounds of incompetency under Section 114, Article 77 of Public Laws of Maryland"). In any event, as noted above, the notice argument has not been preserved for appellate review.

Accordingly, we turn to the teachers' principal argument as to the charges, *i.e.*, that the Superintendent and Local Board "formally charged" them as "incompetent . . . because [they] had received two consecutive needs improvement year-end evaluations" and the State Board was "bound by" those "charges." The teachers assert that since their 1989 year-end evaluation "was defective," *i.e.* "the Procedures were not followed," the State Board, regardless of the evidence, could not uphold the Local Board's decision to discharge them for incompetency. The circuit court agreed, finding that "[t]he charges that were brought were brought for two successive years. The State is bound by that. . . ."

The most fundamental difficulty with this conclusion is it misstates the Statements of Charges. The Statements of Charges do not provide that the teachers are *charged* with receiving "needs improvement" year-end ratings in 1989 and

---

**6.** The other cases that the teachers rely on also involve situations in which a party was not at any time prior to the termination hearing given any notice of the alleged misconduct or what statute or rule she or he assertedly violated; some also involve very different statutory schemes, requiring a specific sort of notice. *See, e.g., Reed v. Mayor & City Council of Baltimore,* 323 Md. 175, 592 A.2d 173 (1991); *Attorney Griev. Comm'n v. Wright,* 306 Md. 93, 507 A.2d 618 (1986).

1990. Nor, contrary to the teachers' claims, do they provide that the teachers are charged with incompetency "because [they] had received two consecutive needs improvement year-end evaluations." What the charges do provide is that each teacher is charged with, and dismissal was recommended for, "incompetency." The teachers, at least implicitly, concede, as they must, that "incompetency" is an entirely adequate statutory ground for dismissal. In fact, it is one of the five grounds for dismissal expressly set forth in the statute. See § 6–202(a)(1)(iv) of the Educ. Art. ("a county board may ... dismiss a teacher ... for: (i) Immorality; (ii) Misconduct in office; (iii) Insubordination; (iv) Incompetency; or (v) Willful neglect of duty.").

Furthermore, the State Board upheld the dismissal of the teachers because it found there was sufficient evidence to uphold the "incompetency" charge. In each case, the State Board expressly recognized that there had been a "failure to have a non-school based observer during the 1988–89 year," yet concluded, after reviewing all the evidence, that there was sufficient evidence to uphold the Local Board's decision to discharge Ms. James and Ms. Davis "on the ground of incompetency." With regard to Ms. James, the State Board specifically found that the "undisputed facts that sustain dismissal for incompetency are Ms. James'[s] failure to have lesson plans, unit outlines, and emergency lesson plans; her failure to submit a quarterly grade distribution sheet; her failure to meet the objectives of the individualized professional assistance plan developed for her in 1989 including her failure to maintain an accurate systematic, cumulative record of student achievement in the area of written composition; her failure to have learning objectives consistent with the appraisal of individual student needs and the requirements of the curriculum framework; and the high failure rate of her students." With regard to Ms. Davis, the State Board specifically found that the "undisputed facts that sustain dismissal for incompetency are Ms. Davis'[s] failure to teach the problem-solving unit; her lack of understanding and failure to present correctly the order of operations; her failure to have unit plans and emer-

gency lesson plans; her failure to record grades; her failure to keep an accurate roll book; and the high failure rate of her students." Thus, the year-end "needs improvement" evaluations, which contained not only each teacher's rating in several categories but also her principal's reasons for the evaluations, were simply evidence of the "for incompetency" charge. Even though the year-end 1988–89 evaluation was procedurally flawed because it was not based on the required observations, evidence as to the quality of the performances of Ms. James and Ms. Davis during that year was properly considered by the State Board in determining if incompetency was demonstrated. This is particularly so in view of the fact that many of the areas in which both teachers were judged incompetent were non-instructional areas, which could not have been reviewed by any observer.

■ Underlying the teachers' argument to the contrary is their claim, without citation to any portion of the record or any authority, that "[o]nly once there have been two consecutive year-end needs improvement evaluations may the Superintendent move to dismiss a teacher for incompetency." The Procedures certainly contain no such requirement.[7] Indeed, the Procedures do not even state that a teacher must receive *one* year-end "needs improvement" evaluation before she or he can be dismissed for incompetency. As noted within, the

---

**7.** At oral argument the teachers' counsel suggested that the following sentence in the Procedures implied that the Procedures required two successive year-end "needs improvement" evaluations prior to dismissal:

A supporting statement must be given to describe the teaching behaviors needing improvements so that satisfactory performance or better might be achieved in the following *evaluation period.*

(emphasis added). Contrary to the suggestion of teacher's counsel, however, there is nothing in the Procedures that defines "evaluation period" to mean "school year." Rather, the Procedures require that all teachers be *"evaluated twice each year* by December 1 and by May 1 if rated as 'Unsatisfactory' or 'Needs Improvement' the previous year." (emphasis added). Thus, for all such teachers, and for Ms. Davis and Ms. James here, there must be at least two "evaluation periods" in each school year. Accordingly, there is nothing in the above quoted sentence of the Procedures that, explicitly or implicitly, requires two year-end "needs improvement" evaluations prior to dismissal.

Procedures do not mention "termination" or "dismissal" or their equivalent. Nor have we found any statute, regulation, or other "procedure" that so provides. Perhaps implicitly recognizing this, the teachers do not rely [8] on the circuit court's suggestion that two successive year-end "needs improvement" evaluations were "probably a requirement because the philosophy of our educational system is to attempt to evaluate, number one; and, number two, improve, if necessary." In our view, the circuit court's statement of the "philosophy of our educational system" is at least an accurate characterization of the "philosophy" or purpose of the Procedures. There were, however, as noted in detail in part (i) of this opinion, numerous observations, assessments, and evaluations of each teacher. Even if the 1988–89 year-end evaluation was procedurally flawed, it did provide the teachers with notice of their failings and an opportunity to improve. Moreover, there were numerous opportunities to "improve" during the 1989–90 school year alone. Furthermore, one year's performance alone has been recognized as providing sufficient grounds for dismissal for incompetency by the Court of Appeals. *See, e.g., Crawford,* 284 Md. at 247, 395 A.2d 835 (teacher dismissed on grounds of incompetency on the basis of *one* year's performance.)

In sum, the teachers were given notice of the charge against them, *i.e.,* recommendation of dismissal "for incompetency," and the State Board disciplined them "as charged" when it

---

**8.** The teachers' only response in their brief to the Local Board's argument that neither the Procedures nor anything else require that dismissal for incompetency be based on two successive year-end "needs improvement" evaluations is to assert that this argument was not made by the Local Board "until the matter reached the State Board after trial before the ALJ." Assuming this is true, what the teachers fail to mention is that it was not until the administrative law judges issued their respective opinions, that there was any determination that the 1988–89 evaluations were procedurally flawed and thus it was only in response to the administrative law judges's opinions that there was any need to make this argument. Furthermore, because the State Board unquestionably had the authority to accept or reject the administrative law judge's recommendations, if an argument was made to the State Board, as this one concededly was, it was properly made before the administrative decision maker. *See Anderson, supra.*

upheld the Local Board's decision to discharge them on the ground of incompetency.

(v)

■ The final joint claim made by the teachers is that because the Local Board allegedly "failed to accord [them] statutory due process" the State Board's "action must be set aside." The Maryland statute upon which the teachers rely, § 6–203, provides in pertinent part:

(d) Submission of transcript and findings.—The hearing examiner shall submit to the county board and appellant:

(1) A transcript of the proceedings and exhibits; and

(2) His findings of fact, conclusions of law, and his recommendation.

(e) Parties may present argument before board.—Parties to the proceedings before the hearing examiner may make arguments before the county board.

(f) Review of record; decision.—(1) After it reviews the record and the recommendation of the hearing examiner, the county board shall make a decision.

§ 6–203 of the Educ. Art.

Although the hearing examiners appointed by the Local Board presented findings of fact, conclusions of law, recommendations, exhibits, and tape recordings of the hearings to the Local Board, in each case the examiner failed to submit a "transcript of the proceedings" in violation of § 6–203(d)(1). Accordingly, the Local Board did not have the entire "record" in the prescribed form, prior to making its decision as required by § 6–203(b)(1). Moreover, the teachers maintain that they were never given "notice and an opportunity to appear before" the Local Board; the Local Board asserts they never asked for such an opportunity; in any event, the teachers did not "present argument" before the Local Board, as provided for in § 6–203(e).

The teachers assert, and the lower court agreed, that these procedural errors by the Local Board require reversal of the State Board's decision, even though, as the teachers concede,

the State Board granted them a *de novo* hearing. The State Board, relying on *Crawford,* 284 Md. at 259, 395 A.2d 835, found to the contrary; "we believe those errors have been cured by our *de novo* review of the record and by the opportunity for oral argument before us." The State Board was correct; *Crawford* is controlling.[9] There, as here, the Local Board had concededly employed "improper procedures in dismissing" a teacher. *Id.* at 259, 395 A.2d 835. Nevertheless, after carefully reviewing the applicable precedents, the Court of Appeals expressly held that "the subsequent de novo administrative hearing by the State Board cured the due process defects in the [local board's] hearing." *Id. See also* 64 Op. Att'y Gen. 125, 130 (1979).

(vi)

Ms. James claims that the State Board's "rationale" for her "dismissal does not measure up to the standard set down by the State Board" in one of its 1985 decisions, *Avery v. Baltimore County Bd. of Educ.,* 4 Op. of MSBE 10 (1985), and so is arbitrary and capricious under the rule set forth in *Montgomery County v. Anastasi,* 77 Md.App. 126, 137–138, 549 A.2d 753 (1988). In *Anastasi,* we held that "by rendering opposite decisions based upon *indistinguishable* facts without explaining the basis for doing so," the agency "had exercised its authority in an arbitrary manner in violation of" the Administrative Procedure Act. *Eaton v. The Rosewood Ctr.,* 86 Md.App. 366, 375, 586 A.2d 804 (1991) (emphasis in original).

Critical to Ms. James's claim that the *Anastasi* rule is applicable here is her assertion that in *Avery* the State Board set forth "standards" that must be met by a local board prior to dismissing a teacher. Thus, Ms. James argues that *Avery*

---

**9.** Nor, contrary to the teachers' suggestion, does *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) require a different result. In *Loudermill* the Supreme Court simply held that a "classified" employee was entitled to notice and an "opportunity to be heard"—not a full adversarial hearing—prior to discharge; both Ms. James and Ms. Davis received notice, an opportunity to be heard *and* a full adversarial hearing prior to discharge. In other words, each of them received *more* than that required by *Loudermill.*

establishes that "in order to sustain the dismissal of a teacher for incompetency a local board must demonstrate in its proofs: (1) that its evaluation process is fair and impartial [which must include 'objective county-code standards,' 'team evaluations and conferences,' 'competent supervisory opinions' and 'repeated observation over a two-year period']; (2) that there are serious teaching deficiencies; and (3) that adequate assistance has been available to the teacher."

We have carefully reviewed the State Board's opinion in *Avery.* It simply states, in detail, the State Board's reasons (the above "proofs") for upholding the local board's dismissal of a teacher in that case. *Avery* contains no mandate that these reasons are required "in order to sustain the dismissal of a teacher for incompetency" in every case. Indeed, it does not even suggest that these reasons are "guidelines" to be followed prior to every dismissal.

Moreover, although *Avery* involves the State Board's decision to dismiss a teacher, in all other respects, its facts, rather than being "indistinguishable" from those at hand, are very different indeed. *Avery* involved the very difficult question of whether to uphold the dismissal of a teacher of "intellectually limited" children who had "very good rapport" and "obvious interest" in them, who had an "ability to make a kid go the extra mile," who was teaching language arts, social studies, science, mathematics, and career education to children in grades 9 through 12, without any curriculum guides in some of these courses, but who had received unsatisfactory evaluations by experienced administrators. There was no equivalently difficult decision here.[10] Contrary to *Avery* where a divided State Board overruled its hearing examiner's decision *on the*

---

10. Indeed, in making her *Anastasi* argument in this Court, Ms. James pointedly notes that it is not an argument of lack of "substantial evidence." In fact, Ms. James does not even claim that there was an absence in her case of the second and third *Avery* "proofs," *i.e.*, serious teaching deficiencies and adequate assistance available to the teachers. Her complaints as to the lack of a fair, impartial evaluation process are either a repetition of her earlier arguments, which we have rejected, or really claims, her protestations notwithstanding, as to lack of substantial evidence.

*merits,* here no administrative body—not the hearing examiner appointed by the Local Board, not the Local Board itself and not the administrative law judge—found, on the merits, that there was insufficient evidence to support Ms. James' dismissal. *Anastasi.* is inapplicable here.

(vii)

Ms. Davis makes two additional claims; neither is preserved for appellate review.

First, Ms. Davis asserts that the State Board's decision on her dismissal "must be reversed because [she] was denied the [benefit] of a proposed decision on the merits crafted by the administrative law judge who received the evidence and heard the case." As noted above, the administrative law judge recommended that the State Board grant Ms. Davis's motion to dismiss "the action of the Local Board," because of the asserted violation of the *Accardi* doctrine. For this reason, the administrative law judge did not reach the merits of Ms. Davis's claim. Ms. Davis claims that the State Board erred in upholding the Local Board's decision on the merits, because it "exercised a function which it had delegated to the [administrative] [l]aw [j]udge." According to Ms. Davis, the State Board "had no greater authority than to *remand* the matter on Davis back to the [administrative] [l]aw [j]udge for further proceedings." (emphasis in original). Ms. Davis straight forwardly recognizes that this claim was not made in the circuit court but asserts that she can raise it on appeal, as an independent basis for "finding the decision of the trial court was correct." *See Robeson v. State,* 285 Md. 498, 503–504, 403 A.2d 1221 (1979), *cert. denied,* 444 U.S. 1021, 100 S.Ct. 680, 62 L.Ed.2d 654 (1980). If Ms. Davis prevailed on this argument, however, she would be entitled only to a remand to the administrative law judge, not a reversal of the State Board's decision, as the trial court ordered. Accordingly, this claim does not provide an independent basis for "finding the decision of the trial court correct." Moreover, Ms. Davis's extremely competent counsel conceded in writing before the State Board that the State Board "could reach the merits on its own,

without returning the matter to the [administrative] [l]aw [j]udge for reconsideration." That statement appears to us to be well founded. *See Eaton v. The Rosewood Ctr.*, 86 Md.App. 366, 586 A.2d 804 (1991).[11] In any event, it clearly indicates that Ms. Davis has, through counsel, waived any argument to the contrary.

Ms. Davis also asserts that the State Board was arbitrary "in that it failed to address" her "claim that she was not given a meaningful opportunity to learn new skills in her subject matter area." Ms. Davis did make this argument before the circuit court. There is, however, nothing in the record extract—or the record itself—to indicate that Ms. Davis made this argument to the State Board. Ms. Davis's counsel filed several memoranda at the administrative level, raising numerous issues, but contrary to his suggestion at oral argument we have been unable to find any reference to this argument in any of those memoranda. For example, in the only memorandum filed on Ms. Davis behalf before the State Board, Ms. Davis's counsel only made the argument addressed in parts (iii) and (v) of this opinion; in a post-hearing letter to the State Board, Ms. Davis's counsel briefly reiterated these

---

11. Nor does *Anderson v. Department of Pub. Safety & Correctional Servs.* hold to the contrary. Indeed, there the Court of Appeals made it clear even when, as here, an administrative law judge makes the initial determination, the "responsibility for the final decision" remains with the agency. *Anderson* 330 Md. at 203, 623 A.2d 198. The "substantial evidence standard is not modified in any way" when the agency and the administrative law judge disagree. *Id.* at 204, 623 A.2d 198 (quoting *Universal Camera Corp. v. Nat'l Labor Relations Bd.*, 340 U.S. 474, 496, 71 S.Ct. 456, 468, 95 L.Ed. 456 (1951)). The administrative law judge's report is, however, "part of the record" and so entitled to some deference, particularly on credibility determinations. *Anderson* at 204, 623 A.2d 198. Accordingly, when an agency disagrees with the administrative law judge, it must state its reasons for doing so. Here, there were virtually no disputed issues of fact and so no credibility determinations here and the State Board did briefly—but clearly—state its reasons for rejecting the administrative law judge's conclusions. The State Board had a complete transcript of the voluminous hearing before the administrative law judge and the exhibits admitted into evidence by the administrative law judge. There would seem to be no impediment to the State Board making its own determination on the merits, without remanding the matter to the administrative law judge.

438

arguments and made the argument raised here by Ms. James alone and addressed in part (vi) of this opinion. In neither the memorandum nor the letter did Ms. Davis's counsel mention her present claim that she was assertedly "not given a meaningful opportunity to learn skills in her subject matter." Because Ms. Davis never made this claim before the State Board, it is hardly error for the State Board to have failed to address it. *See Maryland State Retirement and Pension Systems v. Martin,* 75 Md.App. 240, 248, 540 A.2d 1188 (1988); *Chertkof v. Department of Natural Resources,* 43 Md.App. 10, 16, 402 A.2d 1315, *cert. denied,* 286 Md. 745 (1979).

(viii)

The decision to dismiss a teacher for incompetence is necessarily a difficult one. It not only adversely affects the lives of those directly affected but also poses a potential threat to the morale and sense of professional independence of their teaching colleagues. Local boards are thus often reluctant to order dismissal and, when they do so, the State Board reviews that decision with great care. Not infrequently the State Board orders that a teacher be reinstated. *See, e.g., Waeldner,* 298 Md. at 362, 470 A.2d 332; *Halsey v. Board of Educ. of Garrett County,* 273 Md. 566, 331 A.2d 306 (1975).

▉ Incompetent teaching cannot, however, be tolerated. More than a hundred years ago, Benjamin Disraeli declared, "upon the education of the people of this country the fate of this country depends." Speech to House of Commons, June 15, 1874. What was true in the nineteenth century is even more true today. It is the State Board that is entrusted with the heavy responsibility of overseeing the system by which Maryland's citizens are educated; it must be afforded the latitude to carry out its responsibility. It has proven experience and expertise in evaluating teachers' competence, and its judgments—which are necessarily qualitative in nature—are not to be second guessed by the courts. *See Clark v. Whiting,* 607 F.2d 634, 639–40 (4th Cir.1979) (decisions as to a "teacher's competence and qualifications ... are by their very nature matters calling for highly subjective determinations,

determinations which do not lend themselves to precise quali-fications and are not susceptible to mechanical measurement or the use of standardized tests.")

Tellingly, neither Ms. James nor Ms. Davis makes any claim that the State Board's dismissal decisions were not supported by substantial evidence. Our careful review of the voluminous record in these cases make it clear why this is so. There is not just sufficient evidence to support the State Board's decisions; there is abundant evidence to do so. Moreover, as indicated within, we do not believe that the State Board misinterpreted the Procedures, "overstepped the bounds of the charging document," or violated the *Anastasi* rule. The procedural errors at the Local Board level were clearly "cured" by the *de novo* hearing provided by the State Board. Accordingly, the circuit court erred in both cases in reversing the orders of the State Board.

JUDGMENTS REVERSED.

COSTS TO BE PAID BY APPELLEES.